[No. A028217. First Dist., Div. Three. July 16, 1986.]

MARTIN GARCIA, Plaintiff and Respondent, v.
ESTATE OF TOM NORTON, Defendant and Appellant.

**COUNSEL**

Laurence B. Mitchell for Defendant and Appellant.

Melvyn D. Silver and Edward M. Suden for Plaintiff and Respondent.

## Opinion

**MERRILL, J.**—The Estate of Tom Norton[1] appeals from a judgment entered on a jury verdict in a personal injury action brought by respondent Martin Garcia. We affirm.

### I

This litigation arises out of the explosion of a waste oil tanker truck on April 16, 1982, in San Jose. The facts are not in dispute. Decedent Tom Norton was in the business of obtaining waste oil from service stations and similar outlets, processing the oil, and then selling it to refineries. To carry out this work, Norton had a fleet of two axle tanker trucks, each about eighteen to twenty feet long and six to seven feet wide. Norton would hire individuals to drive the trucks, locate waste oil, purchase the waste oil themselves, sell it to Norton, and unload it at Norton's yard. Norton would then process the waste oil and sell it to refineries.

One of the truck drivers with whom Norton worked was respondent Garcia. Norton paid Garcia for the waste oil he delivered according to the amount and quality thereof; Garcia's income basically consisted of the difference between what Norton paid him for the waste oil and what Garcia had to pay to obtain it. Garcia had a written working agreement with Norton, and his relationship with Norton's business was that of an independent contractor.

Norton had three tanker trucks in early 1980 when Garcia first started working for him. During the course of that year and the next, Norton acquired approximately seven more trucks and a large tanker trailer. He modified the tanker trucks so that they would look and operate alike. Norton purchased the particular tanker truck involved in the subject accident at an auction approximately two weeks prior to the accident. It was "an old used truck" that was "dirty looking," not serviceable or in proper running order, and "needed to be cleaned up."

On April 15, 1982, Norton asked Garcia to take the newly acquired used tanker truck to San Jose Steam Cleaners to have it steam cleaned and prepared

---

[1]The respondent brought suit under Probate Code section 721 which provides in pertinent part: "(b) . . . (4) any recovery in such action by the claimant will be limited solely to the decedent's insurance protection. . . . [¶] (c) The action by the claimant shall name as the defendant 'Estate of (name of decedent), Deceased.' Summons shall be served upon a person designated in writing by the insurer or, if none, upon the insurer. Further proceedings shall be in the name of the estate, but otherwise shall be conducted in the same manner and have the same effect as if the action were against the personal representative. . . ."

for painting and welding so that Norton could modify it to match the other trucks in his fleet. Garcia drove the truck to San Jose Steam Cleaners and Norton followed in a pickup truck so that he could give Garcia a ride back. When they arrived, Garcia told the responsible person at San Jose Steam Cleaners that they wanted the truck prepared for painting and welding, that they were going to "cut a hole on the back of the tank," that it would be necessary to drain everything out or the steam cleaning would be in vain, and that the front bumper of the tanker truck should be raised in this process to facilitate draining out of the back of the tank.

The next morning, April 16, 1982, Norton telephoned Garcia and asked him to come down to his yard to help him work on the truck. When Garcia arrived, Norton told him that they were going to cut the hole in the back of the tank. Garcia observed that the outside of the tanker truck had "obviously" been cleaned since the last time he had seen it the previous day. Norton explained to Garcia that he intended to cut a hole in the rear of the tank with a welding torch, climb into the tank through the manhole, and do some work on the interior of the tank. Garcia was to pass torches, pipes, and other materials through the hole in the back of the truck to Norton working on the inside. Garcia saw the oxyacetylene torch equipment that Norton intended to use. Although it was apparent that the truck had been cleaned on the outside, Garcia could not tell if it was clean on the inside. Norton did not tell Garcia that he had personally inspected the inside of the truck. According to Garcia's trial testimony, he asked Norton if they should purge the tank with a fire extinguisher or dry ice to make it safer to work on with the torch. Norton said no, the tank "was absolutely clean," and he would have to be getting inside the tank and working in there which he would be unable to do if there was no oxygen inside.

Garcia helped Norton drag a heavy pipe to the back of the truck. Norton told Garcia to climb up on top of the tank, open the hatch and note when he cut through the wall of the tank. As Garcia started to climb up on the vehicle, he noticed a bag of "grease sweep" or absorbency material over the hatch. He had observed this bag before the tanker truck was taken to the steam cleaners; it appeared to be in the same position that it had been prior to the cleaning. Garcia saw Norton with the blowtorch lit, but before he could say anything to Norton, the tank exploded violently. Norton was killed instantly, and Garcia suffered injuries.

Photographs taken after the accident showed that there was waste oil inside the tank at the time of the explosion. Garcia testified that he would have been able to see this if he had gotten to the top of the tank, lifted the manhole and observed the interior of the tank with a flashlight before Norton lit the torch and the explosion took place. The force of the explosion was

such that the tank itself was ripped apart into several large pieces and the manhole hatch cover was blown away and never recovered. A baffle from the interior of the tank was blown a quarter mile away. Garcia testified that to his personal knowledge some tank drivers illegally pump chemical solvents into tanker trucks such as the one at issue, that he did not know exactly what was in the subject tanker prior to the explosion, and that Norton never said anything to indicate that he knew either.

Garcia brought suit for personal injuries against San Jose Steam Cleaners and Norton's estate. Garcia and San Jose Cleaners entered into a settlement agreement prior to trial. Following a five-day trial, the jury awarded Garcia $98,400 against Norton's estate. This appeal followed the denial of appellant's motion for a new trial.

## II

■ Appellant argues that the trial court erred in ruling that the activity of welding with a blowtorch on a waste oil tank was ultrahazardous. On the basis of this ruling, the trial court granted Garcia's motion for a directed verdict as to liability. The trial court's ruling was correct.[2]

The modern rule of strict liability without fault for injuries resulting from an ultrahazardous activity was adopted in this state by the decision in *Luthringer* v. *Moore* (1948) 31 Cal.2d 489 [190 P.2d 1]. Applying the standard set forth in the Restatement of Torts, the Supreme Court stated: "'One who carries on an ultra-hazardous activity is liable to another whose person, land or chattels the actor should recognize [are] likely to be harmed by the unpreventable miscarriage of the activity for harm resulting thereto from that which makes the activity ultra-hazardous, although the utmost care is exercised to prevent the harm. . . . An activity is ultra-hazardous if it (a) necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care, and (b) is not a matter of common usage. . . . An activity is a matter of common usage if it is customarily carried on by the great mass of mankind or by many people in the community. . . .

---

[2]Respondent contends that the issue of whether the activity engaged in by Norton was ultrahazardous has been made moot by the following statement in appellant's opening brief: "Admittedly, Norton may have been somewhat negligent in failing to detect that the tanker had *not*, in fact, been steam cleaned, but [respondent Garcia] was himself negligent in failing to take adequate precautionary steps to insure his own safety." Respondent contends that this statement constitutes an admission of liability. Appellant replies that, although the statement "was probably a poor choice of words," and "in retrospect, [Norton] may not have been totally prudent at the time," he did not act "below the standard of care of a reasonable man acting under similar circumstances." In any event, whether or not Norton was negligent is immaterial for our purposes here, since we conclude that the trial court was correct in ruling that the activity in which he was involved was ultrahazardous.

"'. . . [T]he manufacture, storage, transportation and use of high explosives, although necessary to the construction of many public and private works, are carried on by a comparatively small number of persons and, therefore, are not matters of common usage. So, too, the very nature of oil lands and the essential interest of the public in the production of oil require that oil wells be drilled, but the dangers incident thereto are characteristic of oil lands and not of lands in general. . . .'" (*Id.*, at pp. 498-499, quoting from Rest., Torts, §§ 519-521; see also *Lipson* v. *Superior Court* (1982) 31 Cal.3d 362, 374, fn. 7 [182 Cal.Rptr. 629, 644 P.2d 822].) ■ The question of whether a case is a proper one for imposing strict liability is one of law for the court. (*Luthringer* v. *Moore, supra,* 31 Cal.2d at p. 496; *Beck* v. *Bel Air Properties, Inc.* (1955) 134 Cal.App.2d 834, 842 [286 P.2d 954].) Moreover, "'[w]hat facts are necessary to make an activity ultrahazardous . . . is a matter for the judgment of the court.'" (*Beck, supra,* at p. 842.)

■ The evidence adduced at trial supported the trial court's ruling that the activity of welding on a waste oil tanker with a blowtorch was ultrahazardous. Don Myronuk, a professor of mechanical engineering and associate dean of engineering at San Jose State University, who was called as an expert witness by Garcia, testified that waste oil contains gasoline and solvents and is therefore highly combustible and potentially extremely explosive. As little as one quart of gasoline in 2,500 gallons of oil is necessary for an explosion, or between 1 and 7 percent volatile gasoline vapors. The danger of explosion would not be completely eliminated by steam cleaning; and in fact, since the heat of the steam would enhance the release of volatile fumes, such cleaning could actually increase the potential hazard. The most prudent approach is to purge the inside of the truck with an inert gas such as nitrogen or carbon dioxide. Even if this precaution were taken along with visual inspection of the interior of the tank and smelling for vapors, however, there could be no absolute guarantee that cutting through the side of the tank with a blowtorch would not result in an explosion such as the dramatic and devastating one which took place in this case, which was calculated to be equal to two pounds of TNT. In contrast, Norman Johnson, the mechanical engineering expert called by appellant, testified that if the tanker truck was absolutely steam cleaned to the point that "there is no gasoline in there any longer," there would be no hazard at all. In Johnson's opinion, Norton was not negligent in proceeding with welding under the facts of this case; however, Johnson conceded that he himself would "probably" have checked for the smell of any gasoline first. With respect to using a blowtorch on the tank, he testified that "if . . . you smell gasoline vapors you better not cut."

We conclude that there was ample evidence from which the trial court could properly conclude that the subject activity was ultrahazardous. The

activity in which Norton was engaged was incredibly dangerous not only to Norton but to anyone else within a relatively large area. Moreover, the activity was neither commonplace nor customary. (*Luthringer* v. *Moore, supra,* 31 Cal.2d at p. 498; cf. *Pierce* v. *Pacific Gas & Electric Co.* (1985) 166 Cal.App.3d 68, 85 [212 Cal.Rptr. 283] [maintenance of high-voltage powerlines and transformers, while very dangerous, is a pervasive and entirely commonplace activity, and therefore not ultrahazardous].) There was no error in the determination that welding on the tank of a waste oil tanker truck was an ultrahazardous activity.

## III

■ Appellant urges that the theory of strict liability for injuries resulting from an ultrahazardous activity cannot be applied unless the defendant is aware of the abnormally dangerous condition or activity, and has voluntarily engaged in or permitted it. Citing testimony by Norton's wife that Norton customarily welded on waste oil tankers in his own garage at home with his wife and children nearby, appellant argues that strict liability cannot apply in this case because Norton assertedly was unaware of the danger of explosion. The argument is meritless. Appellant has cited no California case which holds that a defendant must have actual knowledge of the true extent of the danger involved in proceeding with an ultrahazardous activity. To the contrary, as stated in *Luthringer* v. *Moore, supra,* 31 Cal.2d 489, one who carries on an ultrahazardous activity is liable for injuries to a person whom the actor *reasonably should* recognize as likely to be harmed by a miscarriage of the ultrahazardous activity, even though "the utmost care is exercised to prevent the harm." (*Id.,* at pp. 498, 500; cf. *Midgley* v. *S. S. Kresge Co.* (1976) 55 Cal.App.3d 67, 72-74 [127 Cal.Rptr. 217].) Furthermore, there was evidence in the record from which it could reasonably be inferred that Norton was aware of the hazards of using a blowtorch on a waste oil tanker.[3]

## IV

■ Next, appellant contends that a finding of ultrahazardous activity does not amount to "absolute liability" because an injured plaintiff may be held to have been comparatively negligent; that there was "ample evidence" at trial upon which respondent Garcia could have been found to have been comparatively negligent; and that the trial court erred in ruling that appellant

---

[3]Portions of the transcript of respondent Garcia's deposition were read into the trial record. During that deposition, Garcia testified that Norton had previously told him that he had always used tanker trucks steam cleaned before using a blowtorch "[b]ecause he wanted the materials to be absolutely clean so there would be no risk of fire or smoke *or worse.*" (Italics added.)

was precluded from arguing the issue of comparative negligence and in essentially directing a verdict against appellant on the issue of liability. We find no error.

There is no question that the principles of comparative fault, under which responsibility and liability for damage are assigned in direct proportion to the amount of fault of each of the parties, are now applicable to actions founded on strict products liability; and that in such actions, a plaintiff's recovery must be reduced to the extent that his own lack of reasonable care contributed to his injury. (*Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725, 731-743 [144 Cal.Rptr. 380, 575 P.2d 1162].) The *Daly* decision did not address the question of whether comparative fault analysis must also be applied in ultrahazardous activity cases. Although certain dicta in *Lipson* v. *Superior Court, supra,* 31 Cal.3d at pages 374-378, may be interpreted as implying such a conclusion, we have been unable to find any reported decision since *Daly* squarely holding that the doctrine of comparative negligence or fault is applicable in actions for personal injuries arising out of an ultrahazardous activity.

There are many obvious parallels between strict products liability and ultrahazardous activity cases, and the rationale for applying comparative negligence or fault to the former would seem equally pertinent to the latter. (See generally, 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, §§ 798-840, pp. 3095-3135; *id.,* (1984 supp.) pp. 477-512.) Nevertheless, a ruling on this issue is not required under the facts presented by the record in this case. Here, there was simply no factual evidence to support a finding of either negligence or assumption of risk on Garcia's part.

Although there was some evidence indicating that Garcia knew that welding on a waste oil tanker truck was potentially dangerous, there was no evidence that he knew of the potential for the kind of explosion that took place here. Moreover, though Garcia was technically an independent contractor, he clearly "worked for" Norton who was, in that sense, his "boss." Norton told Garcia to take the tanker truck to the steam cleaner; the next day, he told Garcia that it was time to weld on the tanker truck; in response to Garcia's question whether the tanker truck should first be purged with an inert gas, Norton told Garcia that the tanker was "absolutely clean"; Norton told Garcia to climb up on top of the tank and open up the hatch of the manhole; before Garcia could get to the hatch and open it in order to check the interior for signs of volatile gas vapors, Norton ignited the blowtorch and the explosion immediately followed; and although Garcia noticed that a greasy bag he had previously observed over the hatch was still there after taking it to the steam cleaners, indicating that the tanker truck had not been thoroughly cleaned, he did not make this observation

until the very moment Norton lit the blowtorch, exploding the tank before Garcia could say anything.

Garcia was entitled to rely on Norton's assurance that the tanker was "absolutely clean," particularly since Norton never indicated to Garcia that he had not personally inspected it himself. Indeed, Norton's statement clearly implied that he *had* checked the interior of the tanker. "The general rule is that one to whom a duty of care is owing by another has the right to assume that the person who owes such duty will perform it; and in the absence of reasonable ground to think otherwise, it is not negligence on the part of the one to whom the duty is owing to assume that he will not be exposed to a danger which can come to him only through a violation of that duty by the person owing it. [Citations.]" (*Gornstein* v. *Priver* (1923) 64 Cal.App. 249, 259 [221 P. 396].) Where an injured party has surrendered his better judgment upon an assurance of safety by one who owes him a duty of care, he does not assume the risk of participating in an activity unless the danger is so obvious and so extreme that there can be no reasonable reliance upon the assurance. (*Woodall* v. *Wayne Steffner Productions* (1962) 201 Cal.App.2d 800, 819 [20 Cal.Rptr. 572].) Here, the evidence shows that Garcia's reliance on Norton's assurance of safety was not unreasonable.

In short, there was no factual evidence in the record that Garcia voluntarily assumed the risk or was negligent in any way in his participation in the activity at issue here. Thus, even if we assume that the doctrine of comparative negligence or fault is applicable to cases involving ultrahazardous activities, there was no error in the court's refusal to give jury instructions on either comparative negligence or fault or assumption of risk. Such instructions were simply not supported by the evidence before the court.

## V

■ Finally, appellant urges that the record is replete with examples of judicial bias, and that it was unable to obtain a fair trial because of the trial court's predisposition on the issue of liability. Appellant's argument on this point rests primarily on the opinion expressed by the trial judge at the time both sides met with him in chambers prior to the jury trial, to the effect that appellant ought to settle the lawsuit because there appeared to be clear liability. On the basis of these comments, appellant made a motion to disqualify the trial judge pursuant to Code of Civil Procedure section 170.6. This motion was untimely as it was not made to the judge supervising the master calendar. However, the parties and the trial judge agreed to treat it as a motion for disqualification of the trial judge on the basis of claimed

bias or prejudice, presumably under former Code of Civil Procedure section 170, subdivision (a)(5).[4] The motion was argued before a different judge and denied. The trial judge in question made a declaration under penalty of perjury denying any bias or prejudice against any of the parties or any commitment as to the outcome of the case. In a meeting with counsel and the presiding judge, the trial judge stated that his earlier statement was made in the context of trying to settle the case prior to trial, an attempt he said he makes with every personal injury case before him.

We agree with the decision below that the facts indicate that there was no prejudice in this instance. Expressions of opinion of this nature by a judge, in what he conceives to be a discharge of his official duties, do not evidence a bias or prejudice which would prevent him from being entirely fair and impartial in the trial. (*Shakin* v. *Board of Medical Examiners* (1967) 254 Cal.App.2d 102, 116-118 [62 Cal.Rptr. 274, 23 A.L.R.3d 1398]; *Mackie* v. *Dyer* (1957) 154 Cal.App.2d 395, 399-401 [316 P.2d 366]; *Estate of Buchman* (1955) 132 Cal.App.2d 81, 104 [281 P.2d 608, 53 A.L.R.2d 451].)

Appellant also contends that the trial judge's prejudice against its case is shown by his erroneous rulings on various objections and motions made by counsel for appellant at trial. The contention is meritless. Errors of law standing alone do not constitute bias or prejudice for purposes of disqualification of a trial judge. (*Calhoun* v. *Superior Court* (1958) 51 Cal.2d 257, 260-261 [331 P.2d 648]; *Mackie* v. *Dyer, supra,* 154 Cal.App.2d at p. 400.)

The judgment is affirmed.

White, P. J., and Scott, J., concurred.

---

[4]At the time of trial, this section provided as follows: "(a) No justice or judge shall sit or act as such in any action or proceeding: . . . (5) When it is made to appear probable that, by reason of bias or prejudice of such justice or judge a fair and impartial trial cannot be had before him."