[No. A087001. First Dist., Div. Four. May 18, 2000.]

DANIEL WILSON, SR., et al., Plaintiffs and Appellants, v.
JOHN CRANE, INC., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I., II., III., and IV.

## COUNSEL

Brayton, Purcell, Curtis & Geagan, Alan R. Brayton, Gilbert L. Purcell, James Geagan, Claudia J. Martin and Joanne E. K. Larson for Plaintiffs and Appellants.

Hassard Bonnington, Philip S. Ward; Cullom Burland Bacon & Overpeck and Destie Lee Overpeck for Defendant and Appellant.

Walsworth, Franklin, Bevins & McCall, Michael T. McCall and Scott S. Shepardson for Thomas Dee Engineering Company, Hamilton Materials, Inc., Quintec Industries, Inc., S.B. Decking, Inc., and Saberhagen Holdings, Inc., as Amici Curiae on behalf of Defendant and Appellant.

Jackson & Wallace, Gabriel A. Jackson and William P. Buranich for Kraft Foods, Inc., Kelly-Moore Paint Company Inc., and American Insurance Association as Amici Curiae on behalf of Defendant and Appellant.

Fred J. Hiestand for Civil Justice Association of California as Amicus Curiae on behalf of Defendant and Appellant.

Morgenstein & Jubelirer, Charles W. LaGrave and Bruce A. Wagman for Owens-Illinois, Inc., as Amicus Curiae on behalf of Defendant and Appellant.

## OPINION

**SEPULVEDA, J.**—This is an appeal from a judgment for plaintiffs Lois and Daniel Wilson, Sr.[1] following a jury trial on their claims for personal injuries and loss of consortium arising from the latter's exposure to asbestos. Defendant John Crane, Inc., raises numerous challenges to the judgment. Plaintiffs have cross-appealed from the judgment insofar as it limits their recovery of noneconomic damages to that proportion of such damages as the jury found attributable to defendant. We find no merit in either side's arguments and affirm the judgment in its entirety.

### BACKGROUND

The parties stipulated at trial that Daniel Wilson was suffering from mesothelioma caused by industrial exposure to asbestos. He testified that from 1955 through 1991, he worked for Arizona Public Service, a public utility, at various power plants. His duties included unpacking and repacking valves, including high-temperature steam valves, and pumps. This sometimes involved chipping out old packing material, which would generate visible dust. He would then apply a small metal brush to the valve seat, followed by an air hose to blow it out, before repacking. The air hose would generate dust from the inside of the valve. While working on valves and pumps in this manner, his face would typically be an arm's length from the packing material. He had packed and unpacked too many valves or pumps to estimate, but "[p]eriodically" it was a regular part of his work.

Mr. Wilson also removed and installed gaskets. He would scrape off some of the gasket material with a scraper, but if it did not all come off he would have to buff it with a power tool. Like the packing material, gaskets "turned real crusty" if they had been in place for quite a while. He would have to use a screwdriver or a homemade tool, together with a hammer, to "tap it and keep popping it out." The remaining gasket material was removed using a pneumatically powered wire brush. This process would generate a visible "trail of dust."

Defendant was one of two manufacturers of the packing material and gaskets Daniel Wilson remembered using. At trial he identified products that looked familiar in one of defendant's catalogs. He testified that plant workers would select a material from a similar book, take the pertinent manufacturer's number to the warehouse, and receive a box of packing. He recognized one item in the catalog as a sheet gasket material that would typically be installed between two flanges without any adhesive. This material would

---

[1]For ease of reference we will omit the "Sr." for the remainder of this opinion.

later be difficult to remove, requiring scraping and wire brushing. He also identified spools of packing material that he used.

Daniel and Lois Wilson brought this action in November 1997 for personal injury and loss of consortium. The complaint named numerous defendants, identifying defendant as among those subject to liability for negligence, strict liability, false representation, intentional tort, and loss of consortium. Defendant answered the complaint with a general denial and various affirmative defenses. The court granted plaintiffs' motion for a calendar preference and advanced the case to trial on the ground that Daniel Wilson was terminally ill and that his survival beyond six months was in doubt.

Plaintiffs settled with various other defendants and went to trial against defendant alone. (See pt. VI, *post.*) After various proceedings, described more fully below, the jury returned a special verdict finding that plaintiffs suffered damages as a result of defective products manufactured by defendant; that 2.5 percent of the total causes contributing to plaintiffs' harm was attributable to defendant; that Daniel Wilson suffered economic damages of over $590,000 and noneconomic damages of $3 million; and that Lois Wilson suffered damages of $1 million for loss of consortium. After entering judgment on this verdict, and denying defendant's motion for new trial or judgment notwithstanding the verdict, the trial court entered an amended judgment adjusting the net award to reflect a credit for plaintiffs' settlements with other defendants. Defendant appealed, and plaintiffs cross-appealed.[2]

## I.-IV.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

## V.

### *Applicability of Civil Code Section 1431.2*

▮ In their cross-appeal plaintiffs contend that the trial court erred by applying Civil Code section 1431.2 (hereafter section 1431.2) to this action.[9] The effect of the statute was to fix defendant's liability for noneconomic

---

[2]Defendant appealed from the original judgment (case No. A086325) but we granted its request to dismiss that matter after filing the notice of appeal here. We also granted defendant's request to "incorporate by reference" the record already prepared in that matter, consisting of the complete reporter's transcript of trial. In addition, we granted plaintiffs' motion for a calendar preference in this court.

*See footnote, *ante*, page 847.

[9]Defendant contends that plaintiffs waived this argument by failing to object in the trial court. However an objection in the trial court would have been futile, since that court was

damages according to its proportional share of responsibility as found by the jury (2.5 percent), thus reducing that item of damages as awarded against defendant from $3 million to $75,000 for Daniel Wilson, and from $1 million to $25,000 for Lois Wilson. Plaintiffs contend that this was error because section 1431.2 is inapplicable to claims for strict products liability both by its terms and as a matter of policy. We conclude that the statute is applicable by its terms, rendering moot any consideration of policy.

Adopted by the voters in 1986, section 1431.2 is the "heart" of Proposition 51, formally but less widely known as the Fair Responsibility Act of 1986. (*Buttram v. Owens-Corning Fiberglas Corp.* (1997) 16 Cal.4th 520, 528, fn. 3 [66 Cal.Rptr.2d 438, 941 P.2d 71].) Subdivision (a) of section 1431.2 provides: "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount."

Division One of this court has already held section 1431.2 applicable to claims for strict products liability. In *Arena, supra,* 63 Cal.App.4th 1178, 1197, the court held, "Proposition 51 is applicable in a strict liability asbestos exposure case where multiple products cause the plaintiff's injuries and the evidence provides a basis to allocate liability for noneconomic damages between the defective products." (See *id.* at p. 1192.) The court reconciled cases involving multiple defendants in the chain of distribution of a single product by holding that such defendants "remain jointly and severally liable to the plaintiff for the harm caused by that product." (*Ibid.*; see *id.* at pp. 1195-1197 [harmonizing *Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618 [65 Cal.Rptr.2d 532]].)

Although plaintiffs assert that *Arena* was wrongly decided, they offer no persuasive ground to depart from its holding. Their principal argument appears to be that an action sounding in strict products liability is not "based upon principles of comparative fault," because strict liability, by definition, excludes any consideration of "fault." The primary weakness in this argument is its reliance on a simplistic literalism blind to established usage.

bound by the decision in *Arena v. Owens-Corning Fiberglas Corp.* (1998) 63 Cal.App.4th 1178, 1181, 1192 [74 Cal.Rptr.2d 580] (*Arena*), discussed below. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) In any event the issue is purely one of law and no avoidable inefficiency or unfair burden results from our addressing it. (See 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, §§ 394, 398, pp. 444-446, 450-451.)

Before addressing that weakness, however, we acknowledge some basis to question, or at least qualify, plaintiff's tacit assumption that strict products liability truly constitutes "liability without fault."

In *Barrett v. Superior Court* (1990) 222 Cal.App.3d 1176 [272 Cal.Rptr. 304], a manufacturer argued that it should not be liable to an end user's heirs for wrongful death because the governing statute limited liability to "wrongful act[s]" and the conduct underlying strict products liability is not "wrongful." (*Id.* at p. 1188.) In rejecting this contention, the court observed that "the conduct which forms the basis for liability . . . under the theory of strict products liability is tortious in nature." (*Id.* at p. 1187.) "Torts are described as 'wrongs' for which society provides a remedy. The term 'wrong' implies some 'fault' on the part of the wrongdoer. The fact that placing into the stream of commerce a defective product which causes injury or death makes the manufacturer and distributor of the product liable in tort is therefore some indication that society ascribes some fault to this conduct." (*Id.* at p. 1188.) Quoting *Montez v. Ford Motor Co.* (1980) 101 Cal.App.3d 315, 318-319 [161 Cal.Rptr. 578], the court continued, " 'Strict products liability is a subtle tort doctrine containing nuances which effectively distinguish it from genuine strict liability [also referred to as 'absolute liability']. Strict liability in the latter sense is equivalent to a compensation system which would render product manufacturers automatically liable for all accidents caused by their product. . . .' " (*Barrett, supra*, 222 Cal.App.3d at p. 1188.) The court quoted another commentator as follows: " 'The doctrine of strict tort liability is referred to as liability without fault. This is true if the concept of "fault" is equated with negligence, for in strict liability a plaintiff is relieved of the burden of showing that the seller or manufacturer failed to act in a reasonably prudent manner in the design, production or sale of his product. Strict liability is not absolute liability, however, for the plaintiff must still prove the product was defective at the time it left the control of the defendant. If "fault" can be equated with the responsibility for placing a defective product into the stream of commerce, then strict tort liability requires a showing of such fault, just as an action for breach of an implied warranty of merchantability requires a showing that the seller was at "fault" in selling a product that was not of merchantable quality.' (1 Madden, Products Liability (2d ed. 1988) § 2.12[,] pp. 41-42, fn. omitted. See also Schwartz, Comparative Negligence (2d ed. 1986) § 12.2 at p. 198: 'Furthermore, Professor Powers has perceptively observed that in spite of some "judicial opinion" language to the contrary, fault has remained the essence of the test in product liability cases based on failure to design a product properly and failure to warn,' quoting Powers, *The Persistence of Fault in Products Liability* (1983) 61 Tex. L.Rev. 777.)" (*Id.* at p. 1189; see *Milwaukee Electric Tool Corp. v. Superior Court* (1993) 15 Cal.App.4th 547, 557-559 [19 Cal.Rptr.2d 24] [noting in essence that strict products liability may be viewed as a species of liability for negligence].)

If "strict liability" is recognized as a somewhat imprecise term, "comparative fault" may be even more misleading. (See *Arena, supra,* 63 Cal.App.4th at p. 1194 [describing "comparative negligence" as a "misnomer"].) The doctrine allocates liability not simply on the relative blameworthiness of the parties' conduct, but on the proportion to which their conduct contributed to the plaintiffs' harm. A more accurate label might well have been something like "comparative responsibility." (See Wright, *Allocating Liability Among Multiple Responsible Causes: A Principled Defense of Joint and Several Liability for Actual Harm and Risk Exposure* (1988) 21 U.C. Davis L.Rev. 1141, 1145.)

In 1978, the Supreme Court itself noted the seeming superiority of a term such as " 'equitable apportionment or allocation of loss.' " (*Daly v. General Motors Corp.* (1978) 20 Cal.3d 725, 736 [144 Cal.Rptr. 380, 575 P.2d 1162].) However, it continued to use the prevailing terminology while declining to place undue reliance on "[f]ixed semantic consistency." (*Ibid.*) The Supreme Court thus used, in a single sentence, both of the seemingly incompatible terms at issue, declaring that "a system of *comparative fault* should be and it is hereby extended to actions founded on *strict products liability*." (*Id.* at p. 742, italics added.) The court emphasized that it was "extending a full system of comparative fault to strict products liability . . . because it is fair to do so." (*Ibid.*) That same year, the court extended the comparative fault regime to actions for equitable indemnity between strictly liable defendants and their codefendants, observing as it did so that "juries are fully competent to apply *comparative fault principles* between negligent and *strictly liable defendants*." (*Safeway Stores, Inc. v. Nest-Kart* (1978) 21 Cal.3d 322, 331 [146 Cal.Rptr. 550, 579 P.2d 441], italics added.) Since then other courts have used both terms, or their equivalents, in the same breath. (See, e.g., *Barrett v. Superior Court* (1990) 222 Cal.App.3d 1176, 1189 [272 Cal.Rptr. 304] ["principles of comparative fault . . . are applicable to actions founded on strict products liability"]; *Garcia v. Estate of Norton* (1986) 183 Cal.App.3d 413, 421 [228 Cal.Rptr. 108] ["[t]here is no question that the principles of comparative fault . . . are now applicable to actions founded on strict products liability"]; *Milwaukee Electric Tool Corp. v. Superior Court, supra,* 15 Cal.App.4th 547, 558 [describing "concepts of fault and comparative fault" as "common to both negligence actions and those founded in strict products liability"].)

Plaintiffs acknowledge some of these cases in their reply brief, but contend that their holdings are inapplicable here. That observation misses

the point. Their relevance is not to dictate a result as a matter of stare decisis, but to demonstrate that at the time Proposition 51 was adopted, the phrase "comparative fault" had an established meaning in the judicial vocabulary—one which embraced and included strict products liability, whether or not such inclusion might offend some notions of "fixed semantic consistency."

In the absence of compelling countervailing considerations, these judicial constructions defeat plaintiffs' arguments because the voters are presumed to have adopted and incorporated accepted judicial constructions when they used the construed terms in their enactment. ■ "The enacting body is deemed to be aware of existing laws and judicial constructions in effect at the time legislation is enacted. [Citation.] This principle applies to legislation enacted by initiative. [Citation.]" (*People v. Weidert* (1985) 39 Cal.3d 836, 844 [218 Cal.Rptr. 57, 705 P.2d 380].) "When an initiative contains terms that have been judicially construed, ' " ' "the presumption is almost irresistible" ' " ' that those terms have been used ' " ' "in the precise and technical sense" ' " ' in which they have been used by the courts. [Citations.]" (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 23 [26 Cal.Rptr.2d 834, 865 P.2d 633]; see *People v. Wheeler* (1992) 4 Cal.4th 284, 302 [14 Cal.Rptr.2d 418, 841 P.2d 938] ["we presume that the voters intended legal terms to have their legal compass"].) The repeated judicial application of the term "comparative fault" to claims and proceedings involving strict products liability strongly suggests, if it does not prove, that the voters intended the term (or must be deemed to have intended it) to encompass such claims.

■ Plaintiffs assert that construing section 1431.2 to apply to strict products liability would deprive the phrase "based upon principles of comparative fault" of any effect, in violation of the principle that courts should avoid interpretations which render statutory language superfluous. (See *Herman v. Los Angeles County Metropolitan Transportation Authority* (1999) 71 Cal.App.4th 819, 826 [84 Cal.Rptr.2d 144].) But the quoted phrase serves the function of placing the statutory mandate in a specific context, i.e., actions for personal injury involving multiple tortfeasors and otherwise subject to the allocation of damages according to principles of comparative fault. That the statute might have been given the same application without this language does not render the phrase meaningless or purposeless, and does not furnish a basis to dramatically depart from established legal usage.

Plaintiffs cite statutes from several other states to illustrate how claims sounding in strict products liability could have been explicitly included in section 1431.2. (See N.Y. C.P.L.R. § 1601 (McKinney 1997) [specific references to manufacturer's "strict liability"]; Fla. Stat. Ann. § 768.81 (West

1997) [refers to "liability" and "parties liable," expressly includes strict liability and product liability claims]; N.M. Stat. Ann. § 41-3A-1 (Michie 1996); Ariz. Rev. Stat. Ann., Courts & Civ. Proceedings § 12-2506 (1998 supp.) ["fault" defined to include acts or omissions "including . . . strict liability, . . . products liability and misuse, modification or abuse of a product"]; Miss. Code Ann. § 85-5-7 (1991) ["fault" includes "strict liability, absolute liability or failure to warn"].) Plaintiffs also cite unenacted California legislation which would have explicitly prescribed the application of comparative fault principles to claims sounding in strict products liability.[10]

These materials are offered to show, in essence, that the voters could have explicitly referred to strict liability claims had they chosen to do so. This point is obvious. It does not follow that the voters' failure to include such a reference shows an intention to exclude those claims from the operation of the statute. Plaintiffs' implicit argument to the contrary ignores the dilemma commonly faced by the drafter of prescriptive language who must choose between a general description of intended scope and a more detailed specification of cases to be affected. A general description may leave uncertainties, leading to litigation which might have been averted by greater particularity; greater specificity, on the other hand, creates the risk of unintended exclusions through the principle of *expressio unius exclusio alterius est* (to express one thing is to exclude others). Here the drafters may have feared that by specifying theories of liability to which section 1431.2 would apply, they would inadvertently exclude claims which they felt ought to be subject to the provision. Their choice of a general descriptive phrase ("action for personal injury, property damage, or wrongful death, based upon principles of comparative fault") undoubtedly left some area for judicial interpretation, but the present claims are not within that area of potential ambiguity because they are of a type clearly understood at the time of the measure's enactment to fall within the description chosen.

Plaintiffs contend that the ballot arguments concerning section 1431.2 support their view that the statute was not intended to embrace strict products liability claims. These materials were included in plaintiffs' grossly overbroad request for judicial notice, which we denied. Plaintiffs never presented a more narrowly tailored request. In any event, plaintiffs' account of the ballot argument would show at most that strict products liability was

---

[10]Copies of these statutes were among the materials of which plaintiffs sought, and we denied, judicial notice.

never pointedly discussed.[11] It does not follow that the accepted meaning and application of the words chosen by the voters may be disregarded.

Plaintiffs contend in effect that the public policy considerations which underlie the law of strict products liability favor "complete joint and several liability" as among defendants to such claims. Such an assertion, however, is simply irrelevant when the legislative branch has spoken through the initiative process. Nor is a different conclusion supported by cases, cited by plaintiffs, in which initiatives were construed not to apply to situations not contemplated by the electorate. Thus in *Hodges v. Superior Court* (1999) 21 Cal.4th 109 [86 Cal.Rptr.2d 884, 980 P.2d 433] (*Hodges*), the Supreme Court held that an uninsured motorist's action against the manufacturer of an automobile was not within the purview of an initiative statute limiting the right of uninsured motorists to recover " 'damages arising out of the operation or use of a motor vehicle.' " (*Id.* at pp. 111-112; Civ. Code, § 3333.4.) The court found the quoted phrase "not pellucid," and in particular found "arising out of" to be less than "transparent." (*Hodges, supra,* 21 Cal.4th at p. 113.) This lack of clarity "obliged" the court to "interrogate the electorate's purpose, as indicated in the ballot arguments and elsewhere." (*Hodges, supra,* at p. 114.) The court concluded in essence that to grant the benefits of the statute to manufacturers of defective automobiles would go far beyond the voters' purposes in adopting the provision, which did not include "benefit[ting] manufacturers of defective vehicles." (*Id.* at p. 117.) Since nothing in the legislative history suggested that voters intended to afford a "windfall" to manufacturers, the court "decline[d] to adopt a broad literal interpretation of the initiative that would raise such 'substantial policy concerns.' " (*Id.* at p. 118, quoting *Calatayud v. State of California* (1998) 18 Cal.4th 1057, 1068 [77 Cal.Rptr.2d 202, 959 P.2d 360].)

The *Hodges* decision has no discernible bearing on the present case. It does not construe similar language. Its result is no more remarkable than if the court had held that the initiative there in issue did not affect a plaintiff's

---

[11]According to the amicus curiae brief of Kraft Foods, Inc., et al., the issue of products liability *was* addressed in the ballot pamphlet, albeit by opponents to the measure, one of whom identified himself as the founder of "Asbestos Victims of America," and another of whom wrote that if the measure were adopted, "innocent people who are injured by dangerous products" would no longer be fully compensated. If true, this statement casts in serious doubt the following representations in plaintiffs' brief: "The legislative history never mentions strict-products-liability defendants." "Strict-products-liability defendants were never contemplated as beneficiaries of the statute." "The fact patterns employed in the initiative's campaign do not mention strict-products-liability cases *at all*. Never." (Italics in original.) These statements may be literally, narrowly true—the arguments may not have used the term "strict," the *proponents* may never have referred to products cases, and so on. At best, however, it is a perilous mode of advocacy to rely on such parsimonious distinctions in making what appear to be sweeping categorical representations to a court of law.

recovery against a defendant who had planted a bomb in the plaintiff's car. The imbalance addressed by the initiative had nothing to do with such claims. That fact informed the interpretation of the patently ambiguous, never-before-construed phrase, " 'arising out of the operation or use of a motor vehicle.' " (*Hodges, supra*, 21 Cal.4th p. 112.) Here, in contrast, the scope and application of the operative phrase to strict products liability claims was already a settled judicial rule and usage. Nor is it apparent that application of the measure to manufacturers would achieve a result irrelevant to, or inconsistent with, the overall purpose of the initiative. The perceived evil to be eliminated by Proposition 51 was the imposition of liability for noneconomic damages far out of proportion to the defendant's share of responsibility for those damages. We see no reason to believe that the voters thought that evil was any less or different when the defendant was a manufacturer held strictly liable for a defective product, particularly when the statute would unquestionably apply to a manufacturer held liable for negligence. The voters chose to use a legal term of art ("comparative fault") which, as we have seen, embraces all such claims. Nothing in *Hodges* permits us to conclude that the term should not be given its accepted meaning and effect.

Plaintiffs also cite *Ault v. International Harvester Co.* (1974) 13 Cal.3d 113, 117 fn. 1 [117 Cal.Rptr. 812, 528 P.2d 1148, 74 A.L.R.3d 986], which held that Evidence Code section 1151, barring evidence of subsequent remedial actions to show "negligence or culpable conduct," does not apply to actions sounding in strict products liability. Like *Hodges*, that case turned on the intended scope of language ("culpable conduct") with no clear established meaning. Plaintiffs assert that the case demonstrates "the importance of keeping public policies supporting different tort concepts in mind when deciding whether rules applicable to one cause of action should also be applied to another." This is obviously a relevant consideration when a court is trying to determine the application of existing rules—even statutory ones—to unforeseen fact patterns. It is not a relevant issue when the Legislature or the voters have addressed the question at hand using words of settled meaning and scope.

Plaintiffs also allude to, and substantially overstate, the comment in *Ault* that rules fashioned for negligence actions "should not be gratuitously extended" to claims for strict products liability. (*Ault v. International Harvester Co., supra*, 13 Cal.3d at p. 120.) We are not concerned here with the potential "extension" of a rule. We are concerned with the meaning of a phrase which was not before the court in *Ault* but which has been repeatedly applied to actions sounding in strict products liability. The mere fact that one statute does not apply to a particular category of cases is no basis to conclude that another statute, containing markedly different language, is also

inapplicable. The court in *Ault* observed that not only was the *purpose* of the statute inapplicable to actions for strict products liability, but the *statutory language itself* indicated a legislative intent to confine the rule there to claims resting on "affirmative fault." (*Id.* at p. 118.)

In sum, plaintiffs fall far short of persuading us that our colleagues in *Arena* wrongly decided the issue before us. We join them in holding that section 1431.2 applies to actions sounding in strict products liability. Accordingly, the trial court did not err in reducing the judgment to reflect only defendant's proportional share of responsibility for plaintiffs' noneconomic damages.

## VI.

### *Reduction of Settlement Credits*

#### A. *Background.*

After trial defendant filed a motion to, in effect, determine the credits to be applied to the judgment by virtue of settlements reached between plaintiffs and other defendants. The gist of the motion appeared to be that the terms of the settlements should be disclosed, the court should determine whether the settlements were entered in good faith, and the credit against the judgment should be calculated accordingly. Plaintiffs responded with a memorandum and declaration setting forth the terms of the settlements and asserting that they were entered in good faith. Although the papers stated that the total value of the settlements was $705,002, the parties ultimately stipulated that the correct total is $1,165,802. Plaintiffs' counsel declared that each of the settlement agreements included an allocation of proceeds 60 percent to the personal injury claims of plaintiff Daniel Wilson, 20 percent to the loss-of-consortium claim of plaintiff Lois Wilson, and 20 percent to the potential wrongful death claims of plaintiffs' heirs. The agreements themselves included undertakings by plaintiffs Daniel Wilson and Lois Wilson to hold the settling defendants harmless from any wrongful death claims which might be brought against them.

As ultimately amended, the judgment recited the jury's findings that Mr. Wilson suffered economic damages of $591,091.51 and noneconomic damages of $3 million; that Mrs. Wilson suffered $1 million in damages for loss of consortium; and that 2.5 percent of plaintiffs' damages were attributable to defendant. The court then calculated the plaintiffs' respective entitlements to damages prior to any settlement credit: for Mr. Wilson, the entire amount of economic damages ($591,091.51) plus 2.5 percent of his noneconomic

damages ($75,000); and for Mrs. Wilson, 2.5 percent of her loss of consortium damages ($25,000). Apart from plaintiffs' contention that the court should not have applied section 1431.2 at all, neither party contests the foregoing calculus.

The court determined the allowable amount to be credited against the present judgment, based on plaintiffs' settlements with other defendants, as follows: First, in accordance with *Espinoza v. Machonga* (1992) 9 Cal.App.4th 268, 277 [11 Cal.Rptr.2d 498], the court determined the ratio of economic damages to total damages awarded by the jury, i.e., $591,091.51 ÷ $4,591,091.51 = 12.9 percent, which the court rounded to 13 percent. In calculating the total damages, the court included both Mr. Wilson's noneconomic damages and Mrs. Wilson's loss of consortium claim. The court applied this ratio (13 percent) to the total amount of pretrial settlements, excluding 40 percent of the settlement amount to reflect the settling parties' allocation to wrongful death and loss of consortium claims. The court applied the resulting figure of $90,932.56 ($1,165,802 × 0.60 × 0.13) as a credit against economic damages, reducing them to $500,158.95, and adding back the noneconomic damages ($75,000) and loss of consortium ($25,000) for a total judgment of $600,158.95.

Defendant contends that the trial court erred by excluding from the calculation sums allocated in the settlement agreements to loss of consortium and wrongful death claims. Defendant argues that such a reduction is unsupported by authority, meaningless because double recovery of economic damages is barred, contrary to the jury's controlling apportionment of fault, and improper without a finding that the settlements were made in good faith. None of these contentions have any merit.

B.   *Availability of Wrongful Death Settlements for Credit.*

It does not appear that any sums properly allocated to wrongful death settlements were applicable to offset the judgment against defendant, because that judgment appears not to include any damages for such claims. A cause of action for wrongful death belongs "not to the decedent [or prospective decedent], but to the persons specified" in Code of Civil Procedure section 377.60, i.e., qualifying heirs and dependents.[12] (Cal. Law Revision Com. com., 14 West's Ann. Code Civ. Proc. (2000 supp.) foll.

---

[12]Daniel Wilson apparently has three children by a previous marriage. These persons were not parties to this action; nor do they appear to have executed any of the settlement agreements. The gist of the agreements as they affected potential wrongful death claims was that the settling plaintiffs undertook to indemnify and hold the settling defendants harmless against any wrongful death claim that might be brought. Arguably this was a distinct contractual undertaking, completely independent of the judgment against defendant. In this

§ 377.60, p. 51.) The damages recoverable in such an action are expressly limited to those *not* recoverable in a survival action under Code of Civil Procedure section 377.34. (Code Civ. Proc., § 377.61; see *Aetna Casualty & Surety Co. v. Superior Court* (1980) 114 Cal.App.3d 49, 57 [170 Cal.Rptr. 527] [insurance company did not breach covenant of good faith by failing to include then inchoate wrongful death claims in settlement of injured person's injury claim for limits of policy].) The statutes expressly authorize the joinder of wrongful death claims with a survival action "arising out of the same wrongful act" (Code Civ. Proc., § 377.62, subd. (a)), and consolidation of all such claims for trial (*id.*, § 377.62, subd. (b)). However, the adjudication of an injury claim without joining prospective wrongful death claims does not in and of itself preclude subsequent assertion of those claims. (*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 284 [87 Cal.Rptr.2d 222, 980 P.2d 927] [decedent's successful prosecution of injury claim is not res judicata as to heirs' wrongful death claim, though collateral estoppel may apply].)[13]

So far as appears on this appeal, the potential wrongful death claimants never recovered a judgment against defendant. Certainly there is no suggestion that wrongful death damages were awarded by the jury. "Since there will be no judgment in [their] favor, [defendant] cannot take advantage of the money paid to [them]." (*Black v. County of Los Angeles* (1976) 55 Cal.App.3d 920, 934 [127 Cal.Rptr. 916].)

Defendant makes no coherent argument on this point in its brief,[14] but asserted in the court below that "the damages which may be put forth in the potential wrongful death case, relate to damages already obtained by plaintiff, i.e., wage loss and loss of consortium," such that withholding those sums from the settlement credit "will result in a double recovery for plaintiff." In support of this proposition defendant cited BAJI Nos. 14.40 and 14.50, *Rodriguez v. Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 404-407 [115 Cal.Rptr. 765, 525 P.2d 669], and *Krouse v. Graham* (1977) 19 Cal.3d

view, the relevant question for present purposes would be whether the amount of consideration paid for this covenant was fixed in good faith, or whether it should be viewed as including amounts necessarily attributable to Daniel Wilson's own personal injury claim.

[13]Indeed defense counsel conceded in the trial court that Mr. Wilson's heirs could, upon his death, bring a separate action against defendant. Logically, this was a concession that the instant judgment did not purport to adjudicate those claims.

[14]Defendant asserts that all economic damages potentially recoverable by the wrongful death claimants have now been recovered by decedent and therefore cannot be allowed in such an action. Accepting that proposition for purposes of analysis only, we fail to see how it affects the present issue. If the heirs recover only noneconomic damages in the hypothetical future action, then defendant can receive no credit in that action. (See discussion *post*, at pp. 863-864.) In any event we fail to see how such considerations entitle it to a credit in *this* action, where it has not been held liable for *any* damages to the heirs.

59, 70 [137 Cal.Rptr. 863, 562 P.2d 1022]. These authorities actually stand for the exact opposite of the point asserted by defendant, *precluding* a future award (and in effect allowing defendant a credit in a future action) for any damages found to duplicate those already recovered by the present plaintiffs.

BAJI No. 14.40 concerns damages for loss of consortium and unequivocally instructs the jury *not* to "include in any such award any compensation for losses that the plaintiff [*spouse claiming the direct physical injury*] may be entitled to recover." BAJI No. 14.50, concerning damages for wrongful death, instructs the jury to compensate the *heirs* for the loss which *they* have suffered, including lost financial support, and to exclude (among other things) the decedent's pain and suffering. The two Supreme Court cases simply elaborate on the principles reflected in these instructions. Indeed *Rodriguez v. Bethlehem Steel Corp.*, *supra*, 12 Cal.3d 382, emphatically concludes that the goal of avoiding double recovery in loss-of-consortium cases does not warrant precluding recovery for the "separate and distinct losses" suffered by the uninjured spouse (*id.* at p. 405), but is adequately met through the "procedural" devices of jury instruction, correction of excessive judgments, and encouraging joinder of claims. (*Id.* at p. 406.)

Far from establishing that the trial court's exclusion of settlements for these items afforded plaintiffs a double recovery, these authorities emphasize the legal distinctness and independence of wrongful death, loss of consortium, and personal injury claims. It follows that the settlement of one such claim may serve as a credit only against a judgment on the same claim. The application of this principle is complicated here by the fact that the settlements did not actually release the heirs' claims but rather obligated the present plaintiffs to hold the settling defendants harmless from those claims. This raises the possibility that the heirs might yet bring their independent claims against defendant, who is not the beneficiary of any such agreement, and might then recover damages some portion of which had effectively already been paid to plaintiffs by other defendants.[15] If the heirs were shown to have actually received the sums earlier paid in settlement, then of course

---

[15]This assumes that some portion of the wrongful death damages would be economic rather than noneconomic in nature. As discussed in more detail in the following section, in the wake of Proposition 51, credits for codefendant settlements are limited to the proportion of economic to noneconomic damages reflected, or deemed to be reflected, in the settlements. However, in contrast to loss-of-consortium claims, wrongful death claims may well include items of economic damage. (See *Krouse v. Graham*, *supra*, 19 Cal.3d at p. 72.) At least one court has held that where an injured plaintiff dies pending trial, converting the action to one for wrongful death, the credit for settlements negotiated prior to the conversion will be calculated under the *Espinoza* formula in the absence of an affirmative showing of some alternative basis to allocate economic and noneconomic damages. (*Ehret v. Congoleum Corp.* (1999) 73 Cal.App.4th 1308, 1322 [87 Cal.Rptr.2d 363].) Thus if the present judgment included an award for wrongful death damages, we would have no difficulty in holding that

those sums would be available for treatment as a settlement credit. If they had not received the sums, then the decedent might be found—or deemed —to have received them as an agent of the heirs, such that the sums so received would still be available as credits against settlement. Alternatively, the defendant might be allowed an equitable claim back against the decedent's estate for sums which should have been applied to offset the heirs' eventual claims. We need not determine how such a hypothetical situation would in fact be best resolved. For present purposes it is enough to note that sums properly allocated to wrongful death claims cannot be automatically applied to a personal injury judgment in favor of the prospective decedent.

### C. *Loss of Consortium.*

Defendant was clearly entitled to no credit for settlement sums properly allocated to Lois Wilson's claim for loss of consortium since she recovered only noneconomic damages on that claim and defendant was entitled to credit only insofar as *economic* damages were compensated by settlement.[16]

Section 1431.2 itself explicitly includes "loss of consortium" in its definition of "non-economic damages." (§ 1431.2, subd. (b)(2); see *Honsickle v. Superior Court* (1999) 69 Cal.App.4th 756, 766 [82 Cal.Rptr.2d 36] ["Beyond question, [the husband's] claim [for loss of consortium] consists entirely of noneconomic damages."]; cf. *Kellogg v. Asbestos Corp. Ltd.* (1996) 41 Cal.App.4th 1397, 1408 [49 Cal.Rptr.2d 256] [although damages described as " 'loss of consortium' " in judgment, relevant testimony "actually involved the 'costs of obtaining substitute domestic services' on [the wife's] behalf (an economic damage item in [section 1431.2])"].)

█ In determining settlement credits in actions governed by section 1431.2, " 'only that part of the settlement value attributable to plaintiff's economic damages may be credited against the nonsettling defendants' liability.' " (*Espinoza v. Machonga, supra,* 9 Cal.App.4th at p. 275, italics

the trial court erred by excluding that portion of the settlements from its calculation of the credit against the judgment. Since the judgment includes no such award, however, we fail to discern how sums received in settlement of the corresponding claims can be treated as a credit in defendant's favor.

[16]It is far from clear that defendant has preserved for appeal any objection to the court's exclusion of the loss-of-consortium allocation from the settlement credits. At the hearing on its motion, the court inquired into the parties' respective positions with respect to the "ratio" to be applied. Counsel for defendant stated, "Your Honor, I think for purposes of this motion now, our attack is on the 20 percent attributable to the wrongful death."

omitted, quoting Flahavan et al., Cal. Practice Guide: Personal Injury (The Rutter Group 1991), ¶ 4:185.20, p. 4-92 (rev. #1 1999); accord, *Hoch v. Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 62-63 [29 Cal.Rptr.2d 615]; *Conrad v. Ball Corp.* (1994) 24 Cal.App.4th 439, 442-443 [29 Cal.Rptr.2d 441].) At least where the plaintiff has received a settlement which fails to differentiate between economic and noneconomic damages, the credit against the later judgment is calculated in proportion to the ratio of economic to noneconomic damages awarded by the trier of fact. (*Espinoza, supra,* 9 Cal.App.4th at p. 277.) But where the damages ultimately awarded consist entirely of noneconomic damages—as is the case with Lois Wilson's loss-of-consortium claims—the logic and arithmetic of *Espinoza* permit no settlement credit whatsoever. There are no economic damages to apportion, the numerator of the governing ratio is zero, and the settlement credit resulting from the *Espinoza* formula is therefore also zero. (*Torres v. Xomox Corp.* (1996) 49 Cal.App.4th 1, 35-36 [56 Cal.Rptr.2d 455] [in such a case, "the total from the settlement, plus the judgment against the nonsettling defendant for that defendant's several share of noneconomic damages, can exceed the total damages awarded" by the judgment].)[17]

Here this means that all damages for loss of consortium should have been excluded entirely from the *Espinoza* calculus. This applies both to amounts awarded by the jury, which should have been excluded in calculating the ratio of economic to noneconomic damages, and to amounts properly allocated to loss of consortium in settlement. The court excluded the amounts awarded in settlement, but left the loss-of-consortium claims in the "total award" for purposes of calculating the *Espinoza* ratio. This resulted in understating the ratio of economic to noneconomic damages, and thus understating the allowable credit, by several percentage points.[18]

---

[17]In a deceptive oversimplification all too typical of both parties' briefs, defendant suggests that a contrary result is supported by *Hernandez v. Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791 [34 Cal.Rptr.2d 732]. Providing no point cite, defendant characterizes that case, as "treat[ing] a wife's loss of consortium claim as the same as her husband's personal injury claim, for the purposes of applying § 1431.2." All that case held, however, was that the trial court had "correctly concluded [that] Wife's recovery of noneconomic damages for loss of consortium was limited to the proportionate fault of defendants." (*Id.* at p. 1811.) The court considered no issue of how the wife's recovery affected, or was affected by, settlement credits.

[18]Excluding loss-of-consortium damages would have reduced the denominator in the *Espinoza* formula by $1 million to $3,591,091.51, increasing the *Espinoza* ratio from 13 percent ($591,091.51 ÷ $4,591,091.51) to roughly 16 percent ($591,091.51 ÷ $3,591,091.51). Indeed plaintiffs originally employed this calculus, arriving at the same figure. Had this ratio been applied to the 60 percent of the settlement proceeds allocable to claims embraced by the judgment (i.e., excluding allocations to wrongful death and loss of consortium), it would yield a net credit of some $111,916.99 ($1,165,802 × 0.60 × 0.16). Subtracting that amount from

Defendant, however, never pressed the correct calculus upon the trial court and indeed, as we have previously noted, scarcely addressed the loss-of-consortium element at all. Indeed the parties *stipulated* that the correct ratio was 13 percent. The burden was on defendant to establish its entitlement to a settlement credit. (See *Conrad v. Ball Corp., supra,* 24 Cal.App.4th at pp. 444-445.) Any error in the court's calculation was waived.

We conclude that sums properly allocated to loss of consortium in the settlements were, like sums properly allocated to potential wrongful death claims, properly excluded from the calculation of settlement credits.

D. *Amount of Allocations.*

Finally defendant asserts that the amounts allocated to loss of consortium and wrongful death claims in the settlement agreements should be disregarded because they were inconsistent with the jury's apportionment of damages and were never found to have been made in good faith. On the first point defendant cites *Greathouse v. Amcord, Inc.* (1995) 35 Cal.App.4th 831 [41 Cal.Rptr.2d 561], where the settling parties had purported to allocate 80 percent of the settlement proceeds to noneconomic damages and 20 percent to economic damages. (*Id.* at p. 837.) The jury awarded total damages consisting of 74.3 percent economic damages and 25.7 percent noneconomic damages. (*Id.* at p. 838.) In a postrial motion, the trial court calculated the settlement credit using the allocations stated in the settlements. (*Id.* at p. 838-839.) Our colleagues in Division One held this to be error, holding in essence that the jury's verdict was binding on the trial court and that, at least in the absence of preverdict judicial approval of the settlement, application of the *Espinoza* formula was mandatory. (*Id.* at pp. 839-841.) En route to this conclusion the court observed that "the allocation of the settlement proceeds according to the proportions recited in a pretrial settlement agreement is inherently suspect. The negotiated allocation between economic and noneconomic damages will inevitably reflect a bias against economic damages that is prejudicial to a nonsettling defendant. The plaintiff has an interest in allocating as little as possible of the settlement to economic damages; the smaller the allocation to economic damages, the less the nonsettling defendants can claim as a credit against a verdict or judgment in the plaintiff's

---

the economic damages found by the jury ($591,091.51) would yield a net award of $479,174.52, to which would be added the noneconomic damages suffered by Mr. Wilson, as adjusted pursuant to section 1431.2 ($75,000), for a total award on his injury claim of $554,174.52, separate and apart from Mrs. Wilson's damages for loss of consortium ($25,000). The aggregate award to both plaintiffs would be $579,174.52, rather than the $600,158.95 awarded by the court.

favor. (See Flahavan, *supra*, ¶ 4:185.22, p. 4-91.) The settling defendants have no incentive to oppose the plaintiff's allocation because they are entirely unaffected by it." (*Id.* at p. 841.)

We take no issue with this analysis, but find it patently inapplicable to the issues before us. That case involved an allocation by settlement parties which, when first presented to the court, conflicted with the jury's verdict and findings. The question was, in essence, which of these allocations should be given effect. Here the settlements did not purport to anticipate the jury's allocation of economic and noneconomic damages. Rather they allocated settlement proceeds among three separate and independent claims: Daniel Wilson's own injury claim; Lois Wilson's loss-of-consortium claim; and the heirs' potential wrongful death claim. The only conceivable overlap was the proportion of damages for loss-of-consortium, as to which the agreed allocation was remarkably close to the jury's verdict. Indeed the $1 million in loss-of-consortium damages found by the jury was *higher* than the allocations in settlement, at just under 22 percent of the total award ($1,000,000 ÷ $4,591,091.51). We fail to see how any reading of the *Greathouse* decision can favor defendant on this appeal.

This brings us to defendant's claim that the settlement agreements should not have been "binding" on it because it was not a party to them and they were never found to be in good faith. We fail to see the relevance of either assertion. Faced with the undisputed fact that the settlement proceeds were consideration for the release of three distinct claims, one of them not adjudicated by the present jury at all, the trial court had to determine how to apportion those proceeds. The question is not whether it (or defendant) was bound by the agreed allocations but whether it could properly find those allocations reasonable and exclude sums thus allocated to irrelevant claims (wrongful death and loss of consortium) from the *Espinoza* calculus. As the party challenging the trial court's ruling on appeal, defendant had the burden here to show why some other allocation, more favorable to it, was compelled by the facts or the law. Defendant failed entirely to carry this burden. If the record is inadequate to that purpose, that too is a matter for which defendant must bear responsibility on this appeal. It was certainly defendant's prerogative, if not its burden, to seek a formal ruling whether the settlements were made in good faith. (Code Civ. Proc., § 877.6, subds. (a)(1) & (d).) Indeed defendant's motion to determine settlement credits initially sought, among other things, a determination whether the settlements were made in good faith. Defendant never pressed that request and never pointedly argued that the settlements were *not* in good faith. We must infer in support of the judgment that the trial court found the amounts allocated in settlement to be

reasonable, made in good faith, and appropriate as bases on which to calculate the settlement credit.

The judgment is affirmed. Each side will bear its own costs on appeal.

Poché, Acting P. J., and Reardon, J., concurred.

The petition of appellant John Crane, Inc., for review by the Supreme Court was denied August 16, 2000.