Filed 3/25/25  A.D. v. C.G. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| A.D.,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>C.G.,<br><br>Defendant and Appellant. | B329351 consolidated with B329349<br><br>(Los Angeles County<br>Super. Ct. Nos. 22LBPT00166,<br> 22PSRO01297) |

APPEAL from orders of the Superior Court of Los Angeles County, Reginald L. Neal, Judge.  Affirmed.

Nonprofit Legal Services, Adam Dolce for Defendant and Appellant.

Law Office of Kasra Parsad and Kasra Parsad for Plaintiff and Respondent.

In these consolidated appeals, appellant C.G.[1] challenges the post-hearing denial of a domestic violence restraining order (DVRO) against respondent A.D. and the subsequent grant of A.D.'s motion to disqualify C.G.'s attorney and romantic partner, Adam Dolce.  In addition to arguing that both rulings were abuses of discretion, C.G. contends automatic reversal is required because the trial court's bias against her, evinced through the challenged rulings and various procedural irregularities, amounts to structural error.  We reject C.G.'s bias argument and affirm both orders.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    The Parties and their Relationship

C.G. and A.D. were in a nonmarital relationship for approximately four years.  They share a daughter, S., who was born in March 2020.  C.G. and A.D. ended their relationship in mid-June 2022; C.G. left the parties' shared San Pedro home with S. and moved across the county to Claremont.

### II.   DVRO Proceedings

#### A.    C.G.'s Request and Temporary DVRO

On July 14, 2022, C.G., acting in propria persona, filed a request for a DVRO against A.D. at the Pomona courthouse.  C.G. alleged that the abuse from which she was seeking protection began on June 18, 2022; prior to that date, "the tension in the house consisted of arguments and verbal abuse" by A.D.; she also claimed unspecified "Mental/emotional, financial, and verbal abuse."

---

[1]     We refer to the parties and their child by initials to protect their privacy.  (See Cal. Rules of Court, rules 8.90(b)(1), (10), (11).)

In the DVRO application, C.G. alleged that on June 18, 2022, two days after she told A.D. she planned to leave him, she decided to record one of their verbal fights on her phone. A.D. saw that C.G. was recording and "yanked" the phone out of her hand while she was holding S. A.D. refused to return the phone and ran outside with it while trying to "delete crucial evidence of the current recording as well as past recordings of his verbal and mental abuse." C.G. left S. alone in the house and chased A.D. When she caught up to him they "wrestled" over the phone, and C.G. ripped A.D.'s shirt. A.D. responded by saying, "'you rip my shirt i'll [*sic*] rip yours,'" and ripped C.G.'s shirt, exposing her breast. C.G. heard S. screaming and went back into the house to get her. C.G. took S. outside and screamed for help. A neighbor, Silvia, came out and helped C.G. with S. C.G. called 911, and the police responded. C.G. left with S. and did not return.

C.G. alleged that between the June 18 incident and the July 14 DVRO request, A.D. "disturbed my peace" and that of her family members by "insist[ing] on talking to" S. and "constantly texting them to get to" S. C.G. sought protection for her family members, including her mother, sister, and brother-in-law. She attached screenshots of text messages between herself and A.D. C.G. requested sole legal and physical custody of S.

On July 14, 2022, the same day C.G. filed the DVRO request, the trial court, Judge Yang, issued a temporary DVRO. The temporary DVRO protected C.G., S., and C.G.'s mother, and gave C.G. sole legal and physical custody of S., with no visitation for A.D. It additionally provided, "Petitioner [C.G.] is permitted to return to family residence to retrieve personal items with law enforcement. Any distribution of personal items/property may constitute abuse under the DVPA [Domestic Violence Prevention

3

Act].” The temporary DVRO was to remain in effect until a hearing on August 4, 2022.

**B.    A.D.'s Response**

On July 29, 2022, A.D., through counsel, filed a response opposing C.G.'s DVRO request. A.D. requested pre-hearing visitation and joint legal and physical custody of S. He disagreed with C.G.'s requested orders. A.D. attached many additional screenshots of text messages between himself and C.G., annotating some of them. He also attached several screenshots of text messages between himself and C.G.'s brother-in-law.

Additionally, on July 20, 2022, also through counsel, A.D. filed a parentage action concerning S. at the Torrance courthouse. Pursuant to Superior Court of Los Angeles County, Local Rules 5.4 and 5.5, the parentage action was deemed related to the DVRO action and became the lead action. The proceedings were transferred to the Long Beach courthouse and assigned to Judge Neal on August 4, 2022. The hearing on C.G.'s DVRO request was continued to August 25, 2022.

**C.    August 25, 2022 and November 8, 2022 Hearings**

C.G. and A.D. appeared before Judge Neal on August 25, 2022 and November 8, 2022 for hearings on C.G.'s DVRO request. Both parties were represented by counsel. Although a reporter was present, there is no transcript of the proceedings in the appellate record. As discussed more fully below, C.G. filed a settled statement pursuant to California Rules of Court, rule 8.137.

**1.    C.G.'s Testimony**

According to the settled statement, C.G. gave the following testimony. She and A.D. met in October 2018 and moved in together after dating for approximately eight months. C.G. and

4

A.D. broke up in 2019 shortly before C.G. "became pregnant," but got back together soon after. C.G. received unemployment benefits during her pregnancy and the pandemic; she gave them to A.D. "based on his representation they were financially struggling." A.D. "controlled the purse strings in the relationship," "routinely criticized" C.G.'s spending, and "lock[ed] her credit card at least two times." A.D. also "admonished" C.G. when she wanted to go to a yoga class "to decompress."

After S. was born, C.G. was her "primary attendant," which caused C.G. "unbearable stress." On one occasion, in November 2020, A.D. told C.G. she was "unfit to be a mother" and "forcibly" took S. from her arms. A.D. pushed C.G. and she landed on her back after falling over a piece of furniture. On another occasion, in January 2022, A.D. pushed C.G. against the wall and put his hands around her neck while she was holding S. In September 2021, A.D. became upset that C.G. had thrown away Indian food and held the leaking bag of Indian food over C.G.'s head while she was nursing S. On a different occasion, A.D. knocked a bowl of pasta out of C.G.'s hand while she was eating it. C.G. and A.D. also had verbal fights; C.G. considered the fights to be verbal abuse and "tried to record" the incidents "out of fear they would become very violent and aggressive." A.D. "punched a wall once out of frustration."

C.G. tried to leave A.D. "on multiple occasions," but was "drawn back based on assurances and promises." On June 18, 2022, after C.G. had informed A.D. that she would be leaving him due to his abuse, the parties "began a verbal altercation." When C.G. tried to record the altercation, A.D. "grabbed her phone, left the house, deleted the recording, and in wrestling the phone away from her, ripped her shirt and exposed her breast. This

caused S[.] to cry hysterically and for [*sic*] [C.G.] to flee the property and to find sanctuary with a neighbor out of fear for her safety." C.G. and S. moved to C.G.'s parents' home in Claremont, "but were unable to take the majority of their possessions as a result of the altercation."

On cross-examination, C.G. conceded that she had slapped A.D. on two separate occasions, once on his back and once on his face. Both incidents occurred in or before October 2020. C.G. denied excessive spending and denied overdrafting A.D.'s credit cards.

C.G. introduced three exhibits: annotated screenshots of text messages the parties exchanged in 2021; a February 6, 2022 Upland Police Department report documenting a "verbal only" incident at a restaurant in which C.G. told officers she "needs space"; and a Los Angeles Police Department report documenting the June 18, 2022 incident.

### 2. A.D.'s Testimony

When he took the stand, A.D. confirmed the timeline of the parties' relationship but disputed much of C.G.'s other testimony. While he acknowledged that "the parties often fought during the relationship," he maintained that the altercations were verbal only and testified that he "never laid a hand on" C.G. A.D. specifically denied pushing C.G. in November 2020 and choking her in January 2022. He admitted confronting C.G. about uneaten Indian food in 2021, but denied holding the food over her head.

A.D. admitted taking C.G.'s phone on June 18, 2022, but testified that he picked it up from a table. He also denied ripping C.G.'s shirt. Regarding the incident in Upland, A.D. testified that he and C.G. had been driving somewhere when she

6

screamed at him to pull over because she wanted to eat dinner. He waited in the car while C.G. and S. ate in the restaurant, and the incident arose when he went inside and asked C.G. to leave. He introduced screenshots of text messages the parties exchanged the following day.

A.D. testified that C.G. hit or slapped him on two occasions in October 2020. He also introduced screenshots of text messages from October 2020 in which C.G. said she "slapped [him] pretty hard" and he maintained she struck him with a closed fist.

A.D. denied any financial abuse of C.G. He testified that he tried to talk to C.G. about their finances, including showing her bank statements, but she refused to discuss the topic with him. He further testified that he did not "lock" C.G.'s credit card, but rather the card could not be used because it was over the spending limit. A.D. testified that C.G. "overspent," including spending "thousands of dollars" in May 2021.

### 3. Court Rulings and Orders

At the request of C.G.'s counsel, the court indicated at the conclusion of the November 8, 2022 hearing that its tentative ruling was to deny the DVRO. After stating its tentative ruling, the court granted C.G.'s counsel's request to hear additional testimony on January 18, 2023. The court ordered the temporary DVRO to remain in effect pending that hearing, including the language authorizing C.G. to "return to family residence to retrieve personal items with law enforcement." The court increased A.D.'s visitation with S.

**D.     C.G. Retrieves Property; Dolce Enters Case; A.D. Seeks DVRO**

C.G. sent A.D. a message through the Talking Parents app[2] on October 18, 2022 to tell him that she would be arriving at the house with the police momentarily to get some of her things and needed him to leave.  A.D. balked at the short notice, but ultimately "vacated for approximately three hours while she retrieved personal belongings."

C.G. again contacted A.D. through Talking Parents on the evening of November 27, 2022 to "inform [him] that I will be packing some of my things to start the move out.  Monday and Tuesday I will be packing my boxes and setting them outside and Wednesday I will have a moving company to move the rest.  A police dispatch will be called for all 3 days.  Each day will be about 6 hrs or so for me to pack and move out."  A.D. responded that the following week would work better.  After more back-and-forth, including a dispute about the extent to which C.G. could remove S.'s things, A.D. told C.G. he "fe[lt] like I am being harassed" and planned to speak to his attorney in the morning.

A.D. sent C.G. additional messages on Talking Parents on the morning of November 28, 2022.  He advised C.G. that he and his attorney were prepared to speak with law enforcement if they arrived at the home.

C.G. did not respond on Talking Parents. Instead, attorney Dolce emailed A.D.'s counsel, explaining that C.G. and her counsel had "authorized" him "to associate in on a limited basis for purposes of this week only," while C.G.'s counsel was on

_____

[2]     At the hearing on August 25, 2022, the court ordered the parties to download the Talking Parents app and use it to communicate about any matters concerning S.

vacation. Dolce stated that he and his nonprofit firm represented C.G. in another matter, and his role here was "limited to [C.G.] seeking to retrieve her and her daughter's personal belongings. . . ." Dolce asserted that C.G. was a joint owner of the property, the temporary DVRO permitted her to retrieve her belongings, and A.D. was likely violating the temporary DVRO by "being obtuse and obstructive." He ended by stating that C.G. "will be at the house today with the police. I strongly encourage your client to not be there when she is." Dolce did not disclose that he and C.G. had been romantically involved since early September 2022.

In a subsequent email sent at 11:46 a.m. on November 28, "to document, in real-time, what's happening right now," Dolce informed A.D.'s counsel that C.G. was at the San Pedro home with police and A.D. was "refusing access." In another email, sent at 12:09 p.m., Dolce stated that C.G. was "going to access the property, [A.D.] has been informed he is risking arrest by staying put, so don't be surprised if he gets arrested." In a declaration related to this incident, A.D. stated that he talked with police and agreed to take his dog for a walk while the police monitored C.G. in the home for about three hours. He stated that the police advised him to seek court orders for protection and exclusive use of the home. A.D.'s counsel notified C.G.'s counsel that A.D. would be requesting those orders the following day.

At 11:29 a.m. on November 29, 2022, A.D.'s counsel filed a request for a DVRO protecting A.D. from C.G. A.D. attached a declaration describing the above events and asserting that C.G. was "using her no-notice TRO to continue to frighten and bully" him, and had caused him "anxiety and sleepless nights and is a total disruption of my emotional calm." He asserted that a

9

protective order providing exclusive use and possession of the San Pedro home was necessary because C.G.'s "representatives are encouraging her aggressive conduct over police objection."

After associating into the case on C.G.'s behalf "for emergency purposes only," Dolce filed a response opposing A.D.'s DVRO request. C.G. asserted that A.D. was already subject to a DVRO and "is trying to use this Court to prevent me from retrieving personal belongings that Court [*sic*] in the related case has already authorized me to retrieve."

Dolce and A.D.'s counsel exchanged several emails on the morning of November 30, 2022. The upshot of the discussion was that Dolce and C.G. would return to the San Pedro home as planned but would leave immediately if the court issued A.D. a temporary DVRO.

According to competing declarations C.G. and A.D. filed later, C.G. and Dolce arrived at the San Pedro home around 12:15 p.m. or 12:30 p.m. A.D. was not home, but his brother was there. According to A.D., who saw C.G. and Dolce on his doorbell camera, C.G. "tried the door and said, 'motherfucker locked it.'" She and Dolce then "began attempting to remove the screens from windows" and "eventually entered my home by pushing out a screen in the window to my laundry room." According to C.G., she "was forced to climb through an unlocked window" because the doors were locked; she "did not believe she was prohibited from climbing through windows I own." She further asserted that when she was almost done, she and Dolce "went about tidying each room to return it to an equal or better condition as we found it."

At 3:01 p.m., while C.G. and Dolce were at the property, the trial court denied A.D.'s DVRO request. A.D.'s counsel emailed

10

the order to Dolce at 3:10.  At 3:33, Dolce responded, "To the surprise of no one.  What a waste."[3]  He continued, "I'll be in touch on the issues we faced here on-site. [A.D.] decided to remotely blast his alarm over and over while [C.G.] and I moved boxes, and his brother was here taking pictures and videos without our consent. . . .  I'll do a debrief in more detail later, but the blasting the alarm over and over is definitely a violation of the TRO."

The following day, December 1, 2022, A.D. filed a second, ex parte request for a DVRO against C.G.  In an attached declaration, he asserted that C.G. and Dolce "entered my home by pushing out a screen in the window to my laundry room," and "remov[ed] things from my home for approximately 4 hours," including "virtually every item of S[.]'s clothing in my possession."  He further asserted that C.G. and Dolce "'trashed' my home, leaving it in disarray."  A.D. attached photos his brother took, which he said showed the pushed-in screen in the laundry room, the "state of disarray that my home was left in on November 30, 2022," and Dolce pushing a dolly up his front walk.

The trial court issued A.D. a temporary DVRO later that afternoon and set the matter for hearing December 21, 2022.  The DVRO required C.G. to refrain from contacting A.D. and to stay away from A.D. and the San Pedro home, with exceptions for matters concerning S.

On December 8, 2022, C.G., through Dolce, filed a request to dissolve or vacate A.D.'s temporary DVRO pursuant to Code of

---

[3]     Dolce later apologized to A.D.'s counsel for his "tone at the beginning of my introduction in this case," which he attributed to allowing his "frustration at these bogus TROs to chip at my professionalism."

Civil Procedure sections 473 and 533. In an accompanying memorandum of points and authorities, C.G. asserted that A.D. "misrepresented the facts" and perpetrated a fraud on the court by falsely claiming that C.G. and Dolce had "trashed" his home. C.G. asserted that the photographs A.D. included in his DVRO request "were clandestine photos taken by Petitioner's brother, . . . *while Respondent [C.G.] was packing*," and that she in fact left the property "in an equal or better condition . . . at the time she left it." C.G. supported this assertion with annotated photographs that she said depicted the property when she arrived and when she left. She requested the motion be heard prior to the hearing on A.D.'s DVRO. That hearing, originally set for December 21, 2022, was continued.

A.D. filed a written opposition to the motion on February 23, 2023. He argued that he was entitled to a hearing on the "factual dispute over the state in which Respondent and her attorney left Petitioner's property," and that neither section 473 nor section 533 of the Code of Civil Procedure provided a basis to vacate the order. C.G. filed a reply in support of the motion the following day.

**E.     January 18, 2023 Hearing**

The parties next appeared in court on January 18, 2023, for the continued hearing on C.G.'s DVRO request. Neither C.G. nor A.D. testified further, and nothing in the record suggests they presented any evidence regarding C.G.'s late November 2022 move-out.

C.G.'s mother, N.R., testified that she provided C.G. and A.D. with financial assistance for their car payments. She also testified about a July 2022 incident in which A.D. was late to pick up S. and "snagged her out of the restaurant mid-meal." On

12

cross-examination, N.R. admitted that she had exchanged text messages with A.D. in which she expressed concern about C.G.'s mental health and "thanked [A.D.] for being thoughtful and doing a good job." Apparently on re-direct examination, N.R. testified that this earlier impression of A.D. had changed after June and July 2022.

Walter M., a neighbor who lived near the San Pedro house but was not identified in C.G.'s DVRO request, testified that on June 18, 2022, he heard "someone screaming in the alley-way" and later heard a man yell from the other side of the gate. Walter M. let C.G. and S. come into his home to wait for the police to arrive. He said C.G.'s shirt was ripped and S. cried hysterically. On cross-examination, Walter M. maintained that C.G.'s shirt was torn.

A.D. called police officer Sherwin Antiporda, who responded to the June 18, 2022 incident. Antiporda testified that he did not recall seeing C.G. with a ripped shirt and further testified that he only saw Silvia, the witness identified in C.G.'s DVRO request, and not Walter M. at the scene. On cross-examination, Antiporda testified that C.G. had looked distraught and appeared to have been crying.

### F. Ruling

The settled statement does not summarize the parties' closing arguments, and they are not included in the limited reporter's transcript, which begins with the court taking the matter under submission. The court made the following oral ruling:

"I am going to consider it submitted. We can go on forever. We can go on forever. [*sic*]

"So here's the court's understanding of the situation, is that the parties, obviously, are not together. And here is the part – there is a part of breaking up that is just ugly. Right?

"And so it really comes down to the court – what was really important to the court is the financial abuse and the whole snatching of the phone, that I believe the respondent actually did.

"Here is the thing about the financial abuse, though. The respondent is basically saying, you know, I have to, you know, budget. I have to start cutting corners. So I couldn't just let the financial thing just to [*sic*] go on. So I could – I can understand that argument. Not that I support it or believe that it is right, but it is an argument, I guess, I would accept.

"So it really comes down to me, about the physical violence between the two. Okay. So when we talk about physical violence, we have both sides admitting that they were both physical. And so then it really comes down to, did this happen over the phone? And, you know, you guys are breaking up. And I believe that your client snatched the phone out of her hand and ran with it. So it really comes down to, am I going to issue a domestic violence restraining order over snatching the phone, in a relationship that was coming to an end? I don't feel comfortable in doing that. Okay.

"I don't hear, you know, the type of physical violence that I generally see in domestic violence. Not saying that, you know – I remember the whole thing that happened with the food. You know, I – you know, I have some questions about that. But, generally, what I see here from you guys, are not the typical abuse that I can really see. And I am not saying that your abuse isn't valid and it didn't occur, it is just that I don't want to put in the middle of all this a restraining order. And, you know, I am

14

probably tipping my hand to the other restraining order that is coming up, but I don't want to put it in the middle of this, a restraining order, because I do believe, ultimately, the issue is custody and the fact that you guys just didn't work out.

"You seem like a good couple, unfortunately you guys have everything I believe going for you. I don't know why you guys couldn't figure it out, but it is – you guys didn't work it out.

"So the court is going to respectfully deny the restraining order in this case; however, it is really a close call."

The court issued two minute orders following the January 18 hearing. The first listed the witnesses who testified and identified the exhibits admitted by reference. It also provided: "The Court finds the party requesting the order of protection did not sustain the applicable burden of proof and accordingly the request is denied. Any temporary restraining order earlier issued is hereby dissolved. The case is ordered dismissed." The second set forth A.D.'s visitation schedule with S. and stated that his DVRO request was set for hearing on February 28, 2023.

**G.     Request for Statement of Decision and Motion to Reconsider**

On January 24, 2023, six days after the court denied her DVRO, C.G. filed a request for a written statement of decision pursuant to Code of Civil Procedure section 632. She requested explanations of the court's findings, "with references to the evidence admitted and witness testimony," as well as "an explanation of the Court's credibility determination as to each party and their witnesses." The court did not issue a statement of decision.

On January 27, 2023, C.G. filed a motion to reconsider the order denying her DVRO. She asserted that "new or different

15

facts justify the Court's attention," namely that A.D. "violated the terms of [C.G.]'s TRO" by obstructing her access to the San Pedro property from November 28 to 30, 2022, blasting his security alarm, and having his brother take photographs while she was there. She further alleged that A.D. "used fabricated evidence to persuade the Court to grant [A.D.'s] no-notice TRO that, inexplicably, the Court chose to resolve *after* resolution of [C.G.]'s Petition." Though these events all occurred prior to the January 18, 2023 hearing date on C.G.'s DVRO request, they were not raised at that hearing. C.G. asserted in a declaration that she "effectively shut-down from believing I had any chance at changing the Court's mind for purposes of the final day of trial. . . ." The court did not immediately rule on the motion.

C.G. filed a notice of appeal from the order denying her DVRO on April 25, 2023.

## III. Disqualification Proceedings

### A. Motion to Disqualify

On February 3, 2023, A.D. moved to disqualify Dolce from representing C.G. under the advocate-witness rule, California Rules of Professional Conduct, rule 3.7. He also sought $15,000 in sanctions under Family Code section 271. A.D. argued that several statements in C.G.'s motion to vacate his DVRO demonstrated "uncertainty as to whether the attorney is testifying as a witness or advocating as an attorney," largely due to Dolce's presence at the San Pedro property during C.G.'s move-out in late-November 2022. A.D. further argued that the three considerations for disqualification set forth in *Doe v. Yim* (2020) 55 Cal.App.5th 573 (*Doe*) all weighed in his favor: Dolce made himself an essential witness by participating in the move-out and was also a collateral witness for child custody issues given his

relationship with C.G., and there could be no tactical strategy or prejudice to C.G. because she still had other counsel and Dolce indicated from the outset that his involvement in the case was only temporary. A.D. argued that sanctions were warranted because Dolce "engaged in uncivil, unprofessional, and vexatious conduct which has strained this case since his arrival."

### B.    Opposition

C.G., through Dolce, filed an opposition to the motion on February 21, 2023. She asserted that the motion was "nothing more than an extension of abuse" "premised on various misrepresentations, an unadjudicated request for a restraining order, and faux attorney-outrage that [C.G.] exercised her rights under the California Code of Civil Procedure." On the merits, she argued that disqualification was unnecessary under the advocate-witness rule because the facts for which Dolce was a percipient witness "are either uncontested or were set forth by [C.G.] herself." C.G. argued that Dolce's statements challenged by A.D. were "factual recitals set forth by [C.G.] for purposes of legal argument," and that A.D. had waived any right to call Dolce as a witness by failing to oppose C.G.'s motions to vacate his temporary DVRO and reconsider the denial of her own DVRO and or subpoena Dolce as his own witness. A.D. subsequently filed an opposition to the motion to vacate.

C.G. further argued that A.D. filed his motion for tactical purposes only, primarily to "make [C.G.] and her attorney look bad by being in a relationship" and "make Dolce look to be 'egregiously unprofessional.'" C.G. asserted that A.D. had the additional tactical aim of "lessen[ing] the blow for how culpable he looks having committed perjury in receiving his TRO, and how terrible it would be if the Court were to reconsider the petition for

17

a DVRO against him based on the undeniable evidence he violated the TRO that was in place against him." C.G. further argued that she would be prejudiced if Dolce were removed because she is indigent and he was representing her pro bono. C.G. contended that sanctions were unwarranted, characterizing the request as "an astoundingly poor waste of judicial resources and attorney time."

In an attached declaration, Dolce stated that his relationship with C.G. "began in a non-legal context in early September of 2022," and became exclusive in early November 2022. He further stated that he "never intended on getting involved in this case" and reviewed the Rules of Professional Conduct prior to doing so. He additionally stated that he had previously represented his "then-wife" in a case in New York without incident. Specifically, he asserted that the judge in that case denied the only disqualification motion to which Dolce had ever been subjected. Dolce acknowledged that he "expressed sarcasm" about A.D.'s DVRO request because it was "such a colossal waste of resources I was shocked any attorney would pursue it," but stated that he subsequently apologized—and still saw "no way" that A.D. was "going to overcome his presentation of false evidence."

## C. Reply

In reply, A.D. disputed Dolce's assertion that he had never been disqualified before. He contended that public pleadings from a court in New York, which he attached, showed that Dolce in fact was "disqualified from representing his wife, Irene, in a family court case in which her ex-boyfriend, Jeffrey, obtained a restraining order against Irene after Irene demanded entry to Jeffrey's apartment to retrieve belongings." A.D. also reiterated

18

his arguments that Dolce should be disqualified under California case law interpreting the advocate-witness rule.

Dolce subsequently filed a notice of errata acknowledging the previous disqualification and "apologiz[ing] for the oversight." He also filed an amended declaration.

### D. February 28, 2023 Hearing and Ruling

On February 28, 2023, Dolce, A.D., and A.D.'s counsel appeared for a hearing. No court reporter was present, nor were C.G. or her retained counsel. On its own motion, the court continued C.G.'s motion to reconsider the denial of her DVRO and her motion to vacate A.D.'s temporary DVRO, though it noted both were "to be heard before [A.D.'s] Restraining Order," which it also continued. According to the settled statement, the court "declined to consider" Dolce's request that the court "hear the Motion to Vacate/Dissolve the TRO before it issued a disqualification order, rendering disqualification a moot point."

According to the minute order concerning the disqualification motion, A.D. was sworn and the matter was argued. "Having read the moving papers and heard all argument," the court granted the disqualification request but denied the request for Family Code section 271 sanctions.

According to Dolce's declaration filed with the settled statement, the court inquired whether Dolce was in a relationship with C.G. on November 30, 2022, and he responded yes. Dolce and A.D.'s counsel then argued about whether disqualification was appropriate. During that argument, Dolce noted that C.G. would not be calling Dolce as a witness. The court asked A.D.'s counsel if she would be calling Dolce, and she answered, "100%." A.D.'s counsel then questioned Dolce's competency and personal feelings toward A.D., and asserted that

19

his involvement in the case had caused A.D.'s fees and costs to "skyrocket." Dolce took umbrage at the allegation of incompetency and asserted that he had no issues with A.D., "but could not abide fraud on the Family Court, and that all the litigation subsequent to November 30, 2022 went back to [A.D.'s] actions above all else." Dolce asserted that A.D. was "using disqualification to draw attention away from his prior fraud (relating to the TRO he had received)," but did not "recall much discussion as to that." Dolce also did not recall much discussion about his assertion that he was offering his services pro bono due to C.G.'s financial status.

According to Dolce, the court stated that it "wouldn't 'have ordinarily disqualified Mr. Dolce," but decided to do so because he was "'on-site' on the day in question" and therefore "'probably' was a material witness." The court noted that C.G. could seek reconsideration of the ruling through her other counsel.

C.G timely appealed the order. After a March 15, 2023 hearing, the trial court stayed all proceedings in which Dolce was involved pending appeal of the disqualification order, including the motions to vacate A.D.'s temporary DVRO and reconsider the ruling denying C.G.'s DVRO.

## DISCUSSION

### I. DVRO

#### A. Legal Principles and Standard of Review

The Domestic Violence Prevention Act (DVPA) is intended "to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (Fam. Code,

20

§ 6220.)  To effect this purpose, trial courts "may" issue a restraining order upon "reasonable proof of a past act or acts of abuse."  (Fam. Code, § 6300, subd. (a).)  "No showing of the probability of future abuse is required."  (*Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 823 (*Rodriguez*).)

The DVPA defines abuse broadly.  It "is not limited to the actual infliction of physical injury or assault" (Fam. Code, § 6203, subd. (b)), and may include behaviors such as "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, . . . harassing, telephoning, … destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party."  (Fam. Code, §§ 6203, 6320, subd. (a).)  "Disturbing the peace of the other party" means "conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party," whether accomplished directly or indirectly, including the exercise of coercive control.  (Fam. Code, § 6320, subd. (c).)

The "Legislature intended that the DVPA be broadly construed in order to accomplish the purpose of the DVPA."  (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1498.)  The trial court is thus "'entrusted with authority to issue necessary orders suited to individual circumstances, with adequate assurances that both sides of the dispute will have an opportunity to be heard before the court.'"  (*Ibid.*)  The permissive "may" in the DVPA gives the trial court "broad discretion in determining whether to grant a petition for a restraining order under this statutory scheme."  (*In re Marriage of Fregoso and Hernandez* (2016) 5 Cal.App.5th 698, 702.)

"Generally, we review a trial court's decision to grant or deny a restraining order under the DVPA for an abuse of discretion."  (*Jan F. v. Natalie F.* (2023) 96 Cal.App.5th 583, 592.)

21

Whether the court applied the correct legal standard while exercising its discretion is a question of law that we review de novo. (*Id.* at pp. 592-593.) To the extent we are called upon to review the trial court's factual findings, we apply the substantial evidence standard of review. (*Curcio v. Pels* (2020) 47 Cal.App.5th 1, 12 (*Curcio*).) Under that standard, "we examine the entire record to determine whether there is any substantial evidence—contradicted or uncontradicted—to support the trial court's findings." (*Ibid.*) "We do not determine credibility or reweigh the evidence. [Citation.] If substantial evidence supports the judgment, reversal is not warranted even if facts exist that would support a contrary finding." (*Ibid.*)

The party seeking a restraining order bears the burden of proving the circumstances justifying the order by a preponderance of the evidence. (*Curcio*, *supra*, 47 Cal.App.5th at p. 11; *Jan F. v. Natalie F.*, *supra*, 96 Cal.App.5th at p. 593.) If the trial court expressly or impliedly concluded the party did not meet that burden, "'"it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. . . . [Instead] the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. . . ." [Citation.]'" (*Jan F. v. Natalie F.*, *supra*, 96 Cal.App.5th at p. 593.)

### B. Analysis

C.G. contends that the trial court applied incorrect legal standards when ruling on her DVRO request. Specifically, she asserts it "did not reference the totality of the circumstances," did not make credibility findings, improperly relied on its "own experience" to conclude the situation was atypical of abuse, did not "address C.G.'s point that it was because of the abuse she finally decided to leave," and "seemed persuaded that the parties

22

breaking-up was sufficient to avoid C.G.'s need for a restraining order." We are not persuaded.

While its oral ruling was ineloquent, the trial court plainly considered the totality of the circumstances when making its ruling. It referenced multiple instances of alleged physical abuse, the nature and severity of that alleged abuse, alleged financial abuse, the parties' breakup, and their ongoing dispute over custody of S. This constellation of facts constitutes the totality of the circumstances here.[4] C.G. has not pointed to, and we have not located, any authority holding that a court must use the phrase "totality of the circumstances" or any other specific wording to demonstrate consideration thereof. Likewise, credibility findings need not be explicitly characterized as such. The court's finding that A.D. "actually did" the "snatching of the phone" implies it found C.G. credible on that point despite inconsistencies in the evidence. Indeed, it acknowledged that it was "not saying that your abuse isn't valid and it didn't occur." Likewise, the court's acceptance of A.D.'s testimony about the alleged financial abuse implies it found A.D. credible on that issue. The absence of express findings regarding the earlier, more serious allegations of physical abuse, which C.G. raised for the first time during the hearing, suggests that the court impliedly found those allegations not credible. We do not revisit these findings on appeal.

C.G. does not explain how the court's conclusion that the circumstances here were "not the typical abuse that I can really

---

[4]     Although C.G. alleged in her DVRO application that A.D. harassed her and disturbed her peace through text messages after the June 18, 2022 incident, the settled statement does not indicate that she testified about those messages at the hearing. The text messages she introduced into evidence were from 2021.

see" was an improper exercise of its discretion.  Because the "DVPA was not enacted to address all disputes between former couples," and a restraining order need not "issue based on any act that upsets the petitioning party," a trial court necessarily must consider the nature and extent of the alleged abuse when exercising its discretion.  (*Curcio*, *supra*, 47 Cal.App.5th at p. 13.) For instance, in *Curcio*, the petitioner sought a DVRO primarily on the basis of a single Facebook post. In concluding that the post did not "rise to the level of destruction of Curcio's mental and emotional calm, sufficient to support the issuance of a domestic violence restraining order," the Court of Appeal contrasted the case with others involving more severe conduct, including *In re Marriage of Nadkarni*, *supra*, 173 Cal.App.4th 1483 and *In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416. (*Curcio*, *supra*, 47 Cal.App.5th at pp. 12-13.)  The need to decide each case on its own facts does not require the trial court to act in a vacuum.  Nor does it require the court to expressly address each point made by the parties.

C.G. points to *Rodriguez*, *supra*, 243 Cal.App.4th 816 and *In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106 (*F.M.*) to support her argument that the court erred by finding the parties' breakup negated the need for a restraining order.  These authorities are distinguishable. In *Rodriguez*, the trial court improperly relied on "the absence of actual violence in the six month period leading up to the hearing, as well as the conclusion that respondent had left the area." (*Rodriguez*, *supra*, 243 Cal.App.4th at p. 823.)  The court in *F.M.* similarly "relied on the fact that [the petitioner] no longer lives with father as a basis for denying her DVRO request," and "repeatedly stated on the record that mother's protection from abuse could be accomplished simply by having her and parties' six children move out of the house." (*F.M.*, *supra*, 65 Cal.App.5th at pp. 119-120.)

24

Here, the court referenced the parties' breakup as the backdrop for the primary incident of alleged abuse—"you know, you guys are breaking up," "there is a part of breaking up that just is ugly," and "am I going to issue a domestic violence restraining order over snatching the phone, in a relationship that was coming to an end?" It did not deny the DVRO based on the lack of an ongoing relationship between the parties, or conclude that "residential separation [w]as a substitute for a DVRO." (*F.M.*, *supra*, 65 Cal.App.5th at p. 120.) Instead, the court concluded that "both sides admitt[ed] that they were both physical" and that A.D.'s grabbing of the phone during the parties' breakup was not sufficiently severe to warrant a DVRO. The evidence does not compel a contrary finding as a matter of law.

C.G. additionally asserts that the court erred because it "failed to consider the possibility A.D. had committed post-filing abuse when he sought his own TRO against C.G." While we agree that "[e]vidence of recent abuse or violation of a TRO is plainly relevant to whether a petitioner should be granted a protective order" (*F.M.*, *supra*, 65 Cal.App.5th at p. 117), the record reflects that C.G. did not bring any such evidence to the court's attention during the DVRO proceedings. The most recent instance of abuse addressed at the hearing was the alleged July 2022 incident mentioned by C.G.'s mother. The alleged DVRO violations at issue occurred on November 30 and December 1, 2022, well before the January 18, 2023 hearing. Yet C.G. did not present any evidence or argument on this issue to the court until she filed her motion for reconsideration more than a week after the court's ruling. The trial court did not abuse its discretion or

deny C.G. a fair hearing by failing to consider evidence she did not timely present.[5]

For all these reasons, C.G. has not shown the trial court abused its discretion in denying her request for a DVRO.

## II.  Disqualification

### A.  Legal Principles and Standard of Review

"A trial court's authority to disqualify an attorney derives from its inherent power, codified at Code of Civil Procedure section 128, subdivision (a)(5), to control the conduct of its ministerial officers and of all other persons connected with its proceedings in furtherance of justice." (*Doe*, *supra*, 55 Cal.App.5th at p. 581.)  The court may disqualify an attorney "as a prophylactic measure against a prospective ethical violation likely to have a substantial continuing impact on future proceedings." (*Ibid.*)  However, the mere appearance of impropriety alone is insufficient to support disqualification.  (*In re Jasmine S.* (2007) 153 Cal.App.4th 835, 843.)

The prospective ethical violation at issue here was violation of the "advocate-witness rule," which "prohibits an attorney from acting both as an advocate and a witness in the same proceeding." (*Kennedy v. Eldridge* (2011) 201 Cal.App.4th 1197, 1208.)  The advocate-witness rule is codified in California Rules of Professional Conduct, rule 3.7, which provides in relevant part: "A lawyer shall not act as an advocate in a trial in which the lawyer is likely to be a witness unless: [¶] (1) the lawyer's testimony relates to an uncontested issue or matter; [¶] (2) the lawyer's testimony relates to the nature and value of legal services rendered in the case; or [¶] (3) the lawyer has obtained

---

[5]  We address C.G.'s related argument about the court's continuation of the hearing on her motion for reconsideration in connection with her bias claim, *post*.

informed written consent from the client." (Cal. Rules Prof. Conduct, rule 3.7, fn. omitted.)

Even if the client provides informed written consent, the trial court retains discretion to disqualify "a lawyer who seeks to both testify and serve as an advocate, to protect the trier of fact from being misled or the opposing party from being prejudiced."[6] (*Id.*, com. 3, citing *Lyle v. Superior Court* (1981) 122 Cal.App.3d 470.) Thus, the court may "disqualify a likely advocate-witness as counsel, notwithstanding client consent, where there is 'a convincing demonstration of detriment to the opponent or injury to the integrity of the judicial process.'" (*Doe, supra*, 55 Cal.App.5th at p. 582.) Although the text of rule 3.7 refers expressly to "a trial," the rule has been interpreted broadly to "encompass a pretrial evidentiary hearing at which counsel is likely to testify." (*Id.* at p. 583.) "The paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process." (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1145.)

"In exercising its discretion to disqualify counsel under the advocate-witness rule, a court must consider: (1) ""whether counsel's testimony is, in fact, genuinely needed""; (2) 'the possibility [opposing] counsel is using the motion for purely tactical reasons'; and (3) 'the combined effects of the strong

---

[6]      C.G. suggests that the trial court failed to consider her informed written consent. However, she does not provide any record citation in support of this suggestion, and our review of the record did not reveal any evidence of informed written consent.

interest parties have in representation by counsel of their choice, and in avoiding the duplicate expense and time-consuming effort involved in replacing counsel already familiar with the case.'" (*Doe*, *supra*, 55 Cal.App.5th at p. 583.) "'[T]rial judges must indicate on the record they have considered the appropriate factors and make specific findings of fact when weighing the conflicting interests involved in recusal motions.'" (*Id.* at p. 584.)

We review the court's ruling on a disqualification motion for abuse of discretion. (*Doe*, *supra*, 55 Cal.App.5th at p. 581.) "Under this standard, the trial court's legal conclusions are reviewed de novo, but its factual findings are reviewed only for the existence of substantial evidence supporting them, and its "'application of the law to the facts is reversible only if arbitrary and capricious.'" (*Id.* at p. 581.) "The court's exercise of discretion must be affirmed on appeal if there is any fairly debatable justification for it under the law." (*Id.* at p. 584.) This court may not "substitute its judgment for the trial court's express or implied findings supported by substantial evidence." (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.*, *supra*, 20 Cal.4th at p. 1143.)

## B. Analysis

C.G. contends the trial court abused its discretion because it found only that Dolce "probably" would be called as a witness, "as to matters that were mostly undisputed." She further contends the court erred by failing to make findings regarding confusion to the factfinder, C.G.'s indigency and interest in having Dolce represent her pro bono, and A.D.'s tactical reasons for seeking disqualification. We conclude the trial court did not abuse its discretion.[7]

---

[7] We reject A.D.'s contention that C.G. failed to preserve the issue for appeal.

28

Under the advocate-witness rule, an attorney "shall not act as an advocate in a trial in which the lawyer is likely to be a witness unless" one of three criteria is satisfied. (Cal. Rules of Court, rule 3.7.) The only criterion argued here and in the trial court is that Dolce's testimony "relates to an uncontested issue or matter." (*Ibid.*) This criterion is not satisfied here. Although C.G. asserts that any potential testimony from Dolce would pertain only to "matters that were mostly undisputed," this assertion is belied by the record. While it is undisputed that Dolce was involved in and physically present during C.G.'s move-out in late November 2022, the parties' agreement ends there. They dispute virtually everything else about the incident. Indeed, C.G. repeatedly argued to the trial court that A.D.'s version of events and supporting evidence was fraudulent. C.G. now asserts that any factual dispute is wholly "resolvable with photographs and videos," and suggests testimonial evidence therefore would no longer be relevant within the meaning of Evidence Code section 210. We reject this assertion. Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination." (Evid. Code, § 210.) Dolce's testimony remains relevant under this standard. Moreover, A.D. may rely on the evidence of his choice to meet his burden of proof, and his counsel said she "100%" planned to call Dolce as a witness during the hearing on A.D.'s DVRO.

Even if we were to assume Dolce's testimony related to an uncontested matter, we are still not persuaded the trial court abused its discretion. According to the settled statement, the court found that Dolce was "probably" a percipient or material witness to the proceedings. C.G. argues—in her reply brief—that even if this finding is correct, it does not satisfy the requirement that the testimony be "genuinely needed." "We generally do not

consider arguments raised for the first time in a reply brief."[8] (*Raceway Ford Cases* (2016) 2 Cal.5th 161, 178.)

But even if we did, we would reject it. "In determining the necessity of counsel's testimony, the court should consider 'the significance of the matters to which he might testify, the weight his testimony might have in resolving such matters, and the availability of other witnesses or documentary evidence by which those matters may be independently established.'" (*Smith, Smith & Kring v. Superior Court* (1997) 60 Cal.App.4th 573, 581.) Here, although the parties had competing photographic and video evidence of the move-out, the testimony of a percipient witness would still carry great weight, and both A.D.'s compliance with C.G.'s temporary DVRO and his entitlement to his own DVRO were at issue. So too was the inflammatory claim by C.G. that A.D. was perpetrating a fraud on the court.

C.G. also contends the court did not consider or make findings related to her indigency. She points to *Lopez v. Lopez* (2022) 81 Cal.App.5th 412, 427, which found error where a court granted a disqualification motion but "failed to demonstrate that it had properly considered appellant's heightened interest in remaining represented by Boone, who had gained mastery over the case by litigating it for over four years, and who was providing his services pro bono or at a discounted rate." Here, the settled statement reflects that Dolce brought C.G.'s financial situation to the attention of the trial court, both during the hearing and "in the written materials the Family Court would

---

[8] We also decline to consider C.G.'s argument that A.D. filed the motion to disqualify for purely tactical reasons, which she develops in her reply brief after asserting in the opening brief only that "A.D. plainly sought disqualification for tactical reasons."

have reviewed." We presume the trial court considered this factor, particularly in light of its comments that it ordinarily would not have disqualified Dolce. (See *Gee v. American Realty & Construction, Inc.* (2002) 99 Cal.App.4th 1412, 1416.) While it would have been preferable for the court to have made more explicit findings, we cannot conclude on the limited record that its ruling is arbitrary and capricious or not fairly debatable.

## III. Judicial Bias

C.G. contends the trial court's "bias against C.G. has tainted the entire proceeding between her and A.D. and that bias amounts to structural error requiring automatic reversal of the orders appealed." We disagree.

### A. Additional Background

In addition to the adverse rulings challenged here, C.G. contends that various procedural rulings and irregularities demonstrate Judge Neal's bias against her. We briefly summarize those rulings and irregularities here, in roughly chronological order.

As noted above, the trial court granted A.D.'s request for a temporary DVRO. C.G. moved to vacate that order on the ground that A.D. misrepresented facts and perpetrated a fraud upon the court. The court continued the hearing on the motion to vacate. It advanced the hearing on the disqualification motion, granted that motion, and then stayed ruling on the motion to reconsider in light of Dolce's disqualification. Thus, it heard the disqualification motion prior to the motion to vacate, even though the latter was filed first.

As also noted above, C.G. requested a statement of decision approximately one week after the court denied her DVRO. The court did not provide one. The court also continued the hearing on C.G.'s motion to reconsider the denial of her request for DVRO, and later stayed the motion due to the pending appeal of

31

Dolce's disqualification. During a hearing on March 15, 2023, when the parties discussed how to proceed in light of the pending appeals, the court at one point told Dolce that it "didn't want to explain" why it stayed the proceedings on motions where Dolce was counsel.

On March 27, 2023, after staying the bulk of the proceedings due to the appeal of Dolce's disqualification, the court proceeded with issues relating to custody of S., for which C.G.'s other counsel made a limited scope appearance. At that hearing, the court appointed counsel for S. and ordered that counsel to "(1) assess the child's physical, mental, and emotional well-being in the parties [*sic*] respective households; (2) find out child's preferences regarding custody and visitation; and (3) assess whether either parent can benefit from therapy or some other type of service."

After C.G. filed her notices of appeal, she completed forms indicating her intention to proceed with settled statements in lieu of reporter's transcripts in both appeals. She filed proposed settled statements with the trial court on June 20, 2023. For reasons unclear from the record, the trial court did not take action on the settled statements. C.G. filed documents calling the omission to the trial court's attention on October 23, 2023. Later that day, the trial court filed an order requesting that C.G. make changes to the proposed settled statement concerning the DVRO order. Specifically, it ordered her to add: "(a) When counsel for [C.G.] made her request for a statement of decision, counsel failed to specify the principle [*sic*] controverted issues. Moreover, at the time of the request, the Court ordered [C.G.]'s counsel to prepare a proposed statement of decision, which counsel failed to comply with the Court's order. (b) When the Court denied [C.G.'s]permanent restraining order, the Court stated that [C.G.] did not prove by preponderance of the evidence that [A.D.'s]

32

conduct, as detailed at the hearing and in the evidence submitted, constitutes abuse as defined in Family Codes 6203&6320. (c) When the court denied [C.G.]'s permanent restraining order, the court stated that it could not ascertain which party, if any, was telling the truth about the material facts in order for this Court to make a determination of whether the burden was met by [C.G.], and therefore [C.G.] did not meet the burden to prove the case by a preponderance of the evidence."

For reasons unclear from the record, the court's October 23, 2023 order was not served on the parties or entered into the court's online docket.  After C.G. alerted the trial court, the order appeared on the docket "[a]t some point between February 1, 2024 to April 16, 2024."

C.G. made the proposed changes to the settled statement, but objected to them as contrary to the contents of the limited reporter's transcript from the January 18, 2023 hearing.  The trial court ultimately certified the settled statements, as C.G. originally submitted them, on April 18, 2024, the day after C.G. filed a motion to disqualify Judge Neal under Code of Civil Procedure section 170.1 due to his alleged bias.  A different judge denied the judicial disqualification motion as moot on May 15, 2024.  C.G. asserts in her brief that the reason for this ruling was that Judge Neal had been reassigned to a different courthouse.

**B.    Legal Principles and Standard of Review**

"In the criminal and habeas corpus contexts, the federal courts have often expressed the rule that structural error occurs when there is a constitutionally intolerable risk or probability of judicial bias." (*Knudsen v. Department of Motor Vehicles* (2024) 101 Cal.App.5th 186, 200 (*Knudsen*).)  State courts also have held, in a civil context, that "the remedy for a hearing conducted without a neutral adjudicator (due to overlapping roles of adjudicator and advocate) was a new hearing conducted by a new

33

officer. . . ." (*Id.* at p. 201, discussing *Nightlife Partners, Ltd. v. City of Beverly Hills* (2003) 108 Cal.App.4th 81.) *Knudsen* specifically rejected the notion that "the absence of an impartial adjudicator [w]as anything other than a structural error." (*Knudsen*, *supra*, at p. 204.) The Supreme Court reached the same conclusion in *People v. Anzalone* (2013) 56 Cal.4th 545, 554, observing "it would be impossible to divine how a trial would have proceeded if a defendant had been allowed counsel or the trial judge had not been biased." (See also *ibid.* ["reversal for structural error has been limited to instances such as adjudication by a biased judge"].)

"In the civil context, structural error typically occurs when the trial court violates a party's right to due process by denying the party a fair hearing." (*Conservatorship of Maria B.* (2013) 218 Cal.Appp.4th 514, 534.) Legal errors such as the application of an incorrect standard of proof generally are not considered structural error that requires automatic reversal. (*Id.* at p. 535; see also *Garcia v. Estate of Norton* (1986) 183 Cal.App.3d 413, 423 ["Errors of law standing alone do not constitute bias or prejudice for purposes of disqualification of a trial judge."].) "Instead, the reported cases have analyzed the error under the *Watson* standard and required a showing it was reasonably probable the appellant would have achieved a more favorable result" absent the error. (*Conservatorship of Maria B.*, *supra*, 218 Cal.App.4th at p. 535.)

"'Bias or prejudice consists of a "mental attitude or disposition of the judge towards [or against] a party to the litigation. . . ."'" (*Roitz v. Coldwell Banker Residential Brokerage Co.* (1998) 62 Cal.App.4th 716, 724, alterations in original.) "When reviewing a charge of bias, '. . . the litigants' necessarily partisan views should not provide the applicable frame of reference.' [Citations.]" (*Ibid*.) "Potential bias must be clearly

34

established." (*Ibid.*) In the context of Code of Civil Procedure section 170.1, a judge may be disqualified where "[a] person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." (Code Civ. Proc., § 170.1, subd. (a)(6)(A)(iii).) Similarly, in the arbitration context, an arbitration award may be vacated where "'the average person could well entertain doubt whether the [adjudicator] was impartial.'" (*Roitz, supra*, 62 Cal.App.4th at p. 723.) "'[A]ppellate courts are not required to speculate whether the bias was actual or merely apparent, or whether the result would have been the same if the evidence had been impartially considered and the matter dispassionately decided [citation], but should reverse the judgment and remand the matter to a different [adjudicator] for a new [hearing] on all issues. [Citation.]'" (*Ibid.*)

### C. Analysis

C.G. contends that "if this Court works backwards" through the rulings and procedural issues summarized above, "it becomes evident the Family Court showcased bias against C.G. such that the entire proceeding was tainted." We are not persuaded.

Several of the events C.G. cites are legal issues subject to review in this appeal, including the findings made in connection with the disqualification order. Others, such as the appointment of counsel for S., in no way evince bias. C.G. makes much of the trial court's failure to issue a statement of decision,[9] but even if we assume her request was timely made under Code of Civil

---

[9] At oral argument, her counsel also contended that the court inaccurately characterized her request for statement of decision as lacking specification as to the principal issues. While C.G. noted the court's remarks in the facts section of her opening brief, she did not identify them as evidence of bias in her argument section.

Procedure section 632, any error in that regard is subject to harmless error review. (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1102.) C.G. has made no effort to show how the absence of a statement of decision has caused her prejudice. She likewise ignores the full context of the court's refusal to explain why it was staying certain orders, which was made at the conclusion of a hearing at which the court previously engaged in colloquy with Dolce and offered several explanations for the stay.

During oral argument, counsel for C.G. focused on the procedural irregularities surrounding the settled statements, primarily the court's request for changes and delay in certifying the statements. While these procedural irregularities are concerning, they do not demonstrate bias. There is no indication that the delay in certifying the statements and properly filing them was anything more than an oversight or ministerial error. The court's requested changes, which ultimately were not incorporated into the settled statements before us, were generally in accord with the minute order prepared contemporaneously with the DVRO hearing, in which the court stated that C.G. "did not sustain the applicable burden of proof." To the extent they were not, C.G. has not carried her burden of demonstrating structural error. (See *Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.) The procedural irregularities do not establish that "the Family Court was trying to tilt C.G.'s appeal against her."

After carefully reviewing the entire record, we are not persuaded that a person aware of the facts might reasonably entertain a doubt about the court's impartiality. We accordingly reject C.G.'s claim of structural error due to judicial bias.

36

## DISPOSITION

The orders are affirmed.  The parties are to bear their own costs of appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, ACTING P. J.


We concur:


MORI, J.


DAUM, J.*


_____

*Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.